Thomas WARD

v.

Richard ACKROYD, Division Engineer, United States Department of Transportation Federal Highway Administration.

SIERRA CLUB, INC., a California nonprofit corporation on its own behalf and on behalf of its members and all the residents of the metropolitan Baltimore region similarly situated, et al.

v.

John A. VOLPE, Individually and as Secretary of Transportation of the United States, et al.

Civ. A. Nos. 71-930-M, 71-1118-M.

United States District Court, D. Maryland.

June 8, 1972.

**1204**

Henry L. Conway, Jr., Glen Burnie, Md., for plaintiff Ward.

George A. Nilson, and Joseph H. H. Kaplan, Baltimore, Md., for all plaintiffs in Sierra Club, Inc., and others.

James W. Moorman, San Francisco, Cal., for plaintiff Sierra Club, Inc.

John E. Bryson, Washington, D. C., for plaintiff Natural Resources Defense Council, Inc.

George Beall, U. S. Atty., Jean G. Rogers, and Jeffrey S. White, Asst. U. S. Attys., Baltimore, Md., Irwin L. Schroeder, Atty., Dept. of Justice, Washington, D. C., and Francis J. Locke, Regional Counsel, Dept. of Transportation, Baltimore, Md., for federal defendants Ackroyd, Volpe, and Turner.

Francis B. Burch, Atty. Gen., of Md., J. Michael McWilliams, Asst. Atty. Gen., Nolan H. Rogers, Sp. Asst. Atty. Gen., Norman Polski, Sp. Atty., and Lloyd J. Hammond, Asst. Atty. Gen., State Highway Administration, Baltimore, Md., for state defendants Fisher, Axelrod, and Hughes.

George L. Russell, Jr., City Sol., and Richard K. Jacobsen, Asst. City Sol., Baltimore, Md., for city defendants Mayor and City Council of Baltimore and F. Pierce Linaweaver.

*Memorandum Opinion*

JAMES R. MILLER, Jr., District Judge.

Pursuant to the order of this court on November 19, 1971, Civil Action No. 71–930–M and Civil Action No. 71–1118–M were consolidated for the limited purpose of hearing, trial, and decision on the common issues of fact and law as to the defendants' satisfaction of the applicable laws and administrative regulations on public hearing requirements for the approval of the location of Segment 9 of Interstate Highway 70N (I–70N) through portions of Leakin and Gwynns Falls Parks. In Civil Action 71–930–M (hereafter referred to as the Ward case), the plaintiff Thomas Ward, a resident taxpayer of Baltimore City and the State of Maryland, has brought an action against Richard Ackroyd, Division Engineer for the Maryland Division, Department of Transportation, who is responsible for the administration of federal highway funds in the State of Maryland by virtue of the delegation of this authority to him by the Secretary of Transportation. An injunction is sought by Ward to restrain Ackroyd from approving the highway design of I–70N from the City Line to Hilton Parkway, from authorizing right-of-way application, from approving construction plans, specifications and estimates, and from authorizing construction of this segment of I–70N until the public hearing requirements of 23 U.S.C. § 128 and Policy and Procedure Memorandum 20–8 (PPM 20–8) are met.

In Civil Action 71–1118–M (hereafter referred to as the Sierra Club case), the plaintiffs include three non-profit corporations, Sierra Club, Inc., Volunteers Opposing Leakin Park Expressway, Inc. (VOLPE, Inc.), and Natural Resource Defense Council, Inc. (NRDC), and two resident taxpayers of Baltimore, Maryland, Harold E. Sleightholm and Norman V. A. Reeves. For convenience the defendants will be classed into three groups: (1) federal defendants, (2) state defendants, and (3) city defendants. All the defendant officials involved are being sued individually and in their official capacities. The federal defendants, all employees of the Department of Transportation, are John A. Volpe, Secretary of Transportation, Francis C. Turner, Federal Highway Administrator, and Richard Ackroyd, Federal Highway Division Engineer for the Maryland Division. The state defendants are David H. Fisher, State Highway Administrator and Chairman-Director of the State Roads Commission for the State of Maryland, Joseph M. Axelrod, Chief of the Interstate Division for Baltimore City, State Roads Commission for the State of Maryland, and Harry R. Hughes, Secretary of the Maryland State Department of Transportation. The city defendants are the Mayor and City Council of Baltimore City and F. Pierce Linaweaver, Director of Public Works for Baltimore City. Plaintiffs in the Sierra Club case seek to enjoin the proposed construction of Segment 9 of I–70N, to restrain the city and state defendants from taking any further action toward construction of Segment 9, to enjoin the federal defendants from authorizing, approving or committing the payment of any federal funds for construction of Segment 9, to enjoin the construction by any defendant of any road connecting with Segment 9 which is likely to foreclose to any significant degree the proper consideration by defendants of alternate transportation facilities, and finally to have this court revoke the various approvals already given by the federal defendants to reconsider these approvals in a manner consistent with federal law.

Jurisdiction of this court is properly asserted under the Federal Question Statute, 28 U.S.C. §§ 1331 and 1361; the Department of Transportation Act, 49 U.S.C. §§ 1651–1659; the Administrative Procedure Act, 5 U.S.C. §§ 500–599, § 701, et seq.; and the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. This consolidated action presents issues concerning the hearing requirements of the Federal Highway

Act, 23 U.S.C. § 128 and the Bureau of Public Roads Policy and Procedure Memorandum 20–8, 34 Fed.Reg. 727–730, 23 C.F.R.App. A, pp. 12–16.

The highway at issue in this case, I–70N, is a part of the 42,500 mile Interstate Highway System authorized by Congress in 23 U.S.C. § 101 et seq. I–70N originates in Frederick, Maryland, where Interstate Highway 70 (I–70) divides into two roads, I–70S proceeding toward Washington, D. C., and I–70N proceeding toward Baltimore.

Congress has declared it to be in the national interest to accelerate the construction of the federal-aid highway system [1] and accordingly has provided for 90% federal financing for the construction of this system with the remaining 10% to be furnished by the respective states.

In the case of I–70N the actual construction is to be undertaken by the State of Maryland (in conjunction with Baltimore City in this particular instance) with federal approval necessary at successive steps in the process as a prerequisite to federal financial participation in defraying the cost of the project. The United States Court of Appeals for the Fourth Circuit has outlined these steps in its recent decision in Arlington Coalition of Transportation v. Volpe, 458 F.2d 1323 (April 4, 1972), opinion modified and rehearing denied (May 9, 1972):

"Before a highway may be constructed with 90 percent federal funds as a part of the Federal Interstate System, the procedure set out by the Federal-Aid Highway Act, 23 U.S.C.A. § 101 et seq., must be followed. First, a route must be selected by the highway department of a state and approved by the Secretary of Transportation. 23 U.S.C.A. § 103(d) & (e) (1). Next, the state highway department must submit to the Secretary for his approval a 'program . . . of proposed projects' that the state wishes to construct with its portion of the funds appropriated for highway construction. 23 U.S.C.A. § 105(a). Then, the state highway department must submit to the Secretary for approval 'such surveys, plans, specifications, and estimates for each proposed project included in an approved program as the Secretary may require.' 23 U.S.C.A. § 106(a). This is known as 'P.S. & E. approval.' As a prerequisite to P.S. & E. approval for each 'project,' the state highway department must certify to the Secretary that it has held public hearings on the location for each project and must submit a transcript of the hearings to the Secretary. 23 U.S.C.A. § 128. Following P.S. & E. approval, project agreements covering construction and maintenance are entered into between the Secretary and the state highway department. 23 U.S.C.A. § 110. Advertisements for bids may then be published and construction contracts awarded. Finally the highway is constructed under the supervision of the state highway department. 23 U.S.C. A. §§ 112, 114." 458 F.2d at p. 1328.

The following consolidated issues have been presented here for determination: (1) whether plaintiffs have standing to maintain this lawsuit; (2) whether plaintiffs are barred by laches from maintaining this lawsuit; (3) whether the doctrine of sovereign immunity precludes maintenance of this suit against the state defendants; (4) whether proper notice was given for a public hearing held on January 30, 1962, purportedly in compliance with 23 U.S.C. § 128 and PPM 20–8 as they existed at that time; (5) whether the hearing of January 30, 1962 was an adequate location hearing under the then applicable provisions of 23 U.S.C. § 128 and PPM 20–8; (6) whether detailed location approval given by defendant Ackroyd on February 28, 1967 complied with the then applicable statutes and regulations; (7) whether the hearing of July 1, 1967 was an adequate location hearing under the then applicable provisions of 23 U.S.C. § 128

1. 23 U.S.C. § 101(b).

and PPM 20–8; and (8) whether additional hearings are required by the 1968 and 1970 amendments to 23 U.S.C. § 128 and the 1969 version of PPM 20–8.

## Facts

Leakin Park and the contiguous portions of Gwynns Falls Park proposed to be traversed by Segment 9 of I–70N together form a regional park of approximately 1200 acres comprising roughly 25% of the total public park acreage located within the city limits of Baltimore. The two parks are located in the western section of Baltimore City and are generally surrounded by fully developed residential areas. It is presently proposed that Segment 9 of I–70N be constructed as a 2½ mile long 8-lane expressway entering Leakin Park at the western city line, traversing the north central portion of the combined park facility and terminating at the proposed interchange with I–170. It is estimated that approximately 130 acres of park land [2] will be required for the construction of Segment 9.

The history of freeway planning within Baltimore City (the City) began in the early 1940's and has produced at least seven major expressway alternatives. A proposed expressway through portions of Leakin and Gwynns Falls Parks, considered since at least 1958 [3] received impetus in late 1960 when the City engaged three local engineering firms to study alternative alignments for the East-West and Southwest Expressways. After examining more than 20 different routes, these consultants, hereafter termed Expressway Consultants, recommended what was to be known as the 10–D system. [4] The 10–D system proposal included an eight-lane expressway through Leakin and Gwynns

Falls Parks and was shown on maps attached to the consultants' study as traversing generally the southern portion of Leakin Park.

On January 30, 1962, a hearing was held at Eastern High School on the proposed location of the East-West Expressway (I–70N) and the Southwest Expressway (I–95). The Chief of the Division of Planning and Programming of the Maryland State Roads Commission, Robert J. Hajzyk, opened the hearing by stating that it was being held in accordance with 23 U.S.C. § 128 and, after reading the published notice of the hearing, he continued as follows:

"This hearing is to be conducted in accordance with the Policy and Procedure Manual Number 20–8 issued by the U.S. Department of Commerce.

"The objectives of the public hearing is (sic) to provide an assured method whereby we can furnish to the public information concerning the proposals for this highway construction and to afford every interested resident of the area an opportunity to be heard on the proposed Interstate project for which purpose this public hearing was called. At the same time, the hearing affords the officials an additional opportunity to receive information from local sources which will be of value to them in making their final decision as to which the several feasible detailed locations should be selected." [5]

At the hearing objections were voiced to any expressway through the parks as well as to the so-called southern alignment through Leakin Park. [6] Several persons recommended in general terms a more northern alignment through Leakin Park.

---

2. Defendants' Joint Exhibit (Defs J.E.) No. 2.

3. Defs J.E. No. 1.

4. Vol. II of Exhibit 2, attached to federal defendants' motion for summary judgment, which Exhibit was received in evidence as part of plaintiff Ward's case. See also Defs J.E. No. 15, pp. 8–9.

5. Exhibit 3, pp. 4, 7–8, attached to federal defendants' motion for summary judgment, which Exhibit (hereafter referred to as "Loc. tr.") was received in evidence as part of plaintiff Ward's case.

6. Loc. tr. 38–39, 105–107, 115–119, 123–124, 132, 158–163, 165–166.

On February 26, 1962, Bernard L. Werner, then Director of the Department of Public Works of Baltimore City, forwarded four copies of the hearing transcript to E. F. Gleason, Division Engineer of the Bureau of Public Roads, and on June 20, 1962, the Chairman-Director of the State Roads Commission also forwarded the transcript to Mr. Gleason.[7] In a letter dated October 7, 1963, the Division Engineer approved the general location of I–70N recommended by the State, making reference to previous letters from the State which discussed the effect of the route chosen and the reasons for that choice. The letter of October 7, 1963 specifically noted that the approval was of ". . . broad traffic corridors and that preliminary engineering studies will determine exact locations which are feasible of design, construction and operation," in accordance with Interstate standards.[8]

In December, 1961, the consultants who recommended the 10–D system acknowledged the engineering feasibility of a more northerly alignment in Leakin Park.[9] Opposition to the southern alignment in Leakin Park continued after the 1962 hearing, resulting in the appointment of the "Sondheim Committee" by the Mayor of Baltimore for the purpose of evaluating the possible alignments. In August, 1964 the "Sondheim Report" evaluated three alignments in Leakin Park, one on the south slope, one in the central valley and one on the central ridge (the northern alignment), concluding that the northern alignment was the least objectionable.[10] An independent analysis by another planning consultant, Sasaki-Walker and Associates, submitted in October, 1964, substantially corroborated the recommendations of the Sondheim Committee.[11]

On February 8, 1965, the City of Baltimore notified the State Roads Commission that further consideration of the southern alignment in Leakin Park was futile due to widespread opposition. The letter from the City to the State Roads Commission notes that interested public agencies had "given favorable consideration to a more northerly location for the route in the Leakin Park corridor."[12]

On February 11, 1965, the State Roads Commission informed the Division Engineer of the practical rejection of the southern alignment through Leakin Park and recommended approval of the preparation of preliminary sketches of a northern alignment.[13] Federal approval of a study of the northern alignment was given on February 15, 1965. After completion of the study, the State Roads Commission, by letter of February 23, 1967, requested approval of the northern alignment.[14] This was approved on February 28, 1967.[15]

On June 1, 1967 a public hearing was held before the Judiciary Committee of the City Council of Baltimore on the proposed condemnation ordinance necessary to allow acquisition of the right of way then in private ownership on the alignment between the western city boundary and Pulaski street which had been approved by the Division Engineer on February 28, 1967. This hearing, at which various officials of the Interstate Division of the State Roads Commission and of the Baltimore City Department of Public Works were present, was also advertised in newspapers of general cir-

---

7. Defs J.E. No. 10.

8. Exhibit 8, attached to federal defendants' motion for summary judgment, which exhibit was received in evidence as part of plaintiff Ward's case.

9. Plaintiff Sierra's Exhibit No. 9.

10. Defs J.E. No. 8.

11. Defs J.E. No. 9.

12. Exhibit No. 10, attached to federal defendants' motion for summary judgment.

13. Exhibit No. 11, attached to federal defendants' motion.

14. Exhibit 13, attached to federal defendants' motion.

15. Exhibit 14, attached to federal defendants' motion.

culation in Baltimore City,[16] purportedly in compliance with the applicable PPM 20–8 in order to qualify as a location hearing under 23 U.S.C. § 128 for the purpose of providing " . . . factual information which is pertinent to the determination of the final location considered by the City and State to serve best the public interest and on which improvement projects are proposed to be undertaken."[17] At that hearing plaintiff Ward expressed opposition to the East-West Expressway in general and to any route or alignment through Leakin Park and Gwynns Falls Park in particular.[18]

In October, 1967 the Interstate Division of the State Roads Commission, on behalf of Baltimore City as well as the State Roads Commission, engaged an "Urban Design Concept Team" (Concept Team), composed of a joint venture of highway engineers, traffic and transit planners, architects, and urban planners as well as specialists in the fields of sociology, economics, housing, and systems analysis, to design the City's Interstate Highway System and plan the land uses and development in the highway corridors. The Concept Team was charged " . . . with the task of designing a highway system which would 'provide for the social, economic, and aesthetic needs of the City's environment as well as provide an efficient transportation facility.' "[19] In late 1967 or early 1968 [20] the Concept Team, based on a preliminary study of potential long-term development of Leakin Park, recommended that it be allowed to make "a thorough study of the best possible designs for both the northern and the southern route, supplemented by a study of the long-range potential for maximum recreational use of Leakin Park before a final determination on a route is made."[21] Permission was granted and the Concept Team, after reaffirming that a route through Leakin Park was the only feasible one because of existing residential development surrounding the park and the limitations in choice of a route bypassing the park imposed by the Security Boulevard Interchange already under construction just west of the City boundary line,[22] studied three alternative routes through Leakin Park. After considering a myriad of social, environmental, and aesthetic factors, the Concept Team concluded " . . . that the northern route presents the best opportunity for minimizing the expressway's impact on both the surrounding park user areas as well as the surrounding residential neighborhoods . . . ."[23] Although the exact date of this memo is unknown,[24] the conclusions of the Concept Team set forth therein were apparently reached sometime in or near the summer of 1968 based on the projected schedule for preliminary planning work in Leakin Park to which the Concept Team referred in its request for permission to reevaluate the Leakin Park route.[25] The record is silent on whether or not there was any formal reapproval by the appropriate city, state or federal officials of the northern alignment in Leakin Park subsequent to the reaffirmation by the Concept Team of the desirability of that alignment. In October, 1968, however, the Concept Team presented their findings to the Mayor and the State Roads Commission on several alternative locations for the proposed expressway system. In December,

16. Defs J.E. No. 5A.

17. Defs J.E. No. 6, pp. 7–8; 10–11.

18. Defs. J.E. No. 6, pp. 75–77.

19. Defs J.E. No. 2, p. iv.

20. Testimony on December 23, 1971 of Richard H. Trainor, Chief of Bureau of Management of State Highway Administration.

21. Plaintiff Sierra's Exhibit No. 18.

22. Defs J.E. No. 18, p. 1; see also Defs J.E. No. 2, p. 14.

23. Defs J.E. No. 18, p. 4; see also Defs J.E. No. 2, pp. 14–16.

24. It was sent to several federal, state, and city highway officials by memo dated June 18, 1969.

25. Plaintiff Sierra's Exhibit No. 18, p. 4.

1968, the Mayor selected the so-called 3–A alignment for the City's Interstate System.[26] The 3–A alignment, insofar as Leakin Park is concerned, coincides with the so-called northern alignment.[27] The 3–A system was approved by the Federal Highway Administrator in January, 1969.[28]

In January, 1969, the Federal Highway Administration published a new public hearing regulation PPM 20–8. Where the earlier version of PPM 20–8 required only one hearing, the new regulation called for two, the first dealing generally with "corridor" location and the second with detailed location and design.

Paragraph 6(d) of the new PPM 20–8 made specific provision for projects which had been the subject of public hearings prior to January, 1969. Additional hearings were required in certain specified circumstances. On January 31, 1969, the Division Engineer completed a review of Interstate Highway projects in the Baltimore area to determine which projects would require either additional location hearings or additional design hearings. He determined that I–70N through Leakin Park would require a design hearing but that a corridor location hearing would not be necessary.[29]

On May 25, 1971, a hearing was held at Edmondson High School in Baltimore City on the design of I–70N from the west city line to Hilton Parkway by the State Roads Commission of Maryland, Interstate Division for Baltimore City.[30]

### I. *Standing*

■ No challenge has been made to the standing of Ward to sue in Civil No. 71–930–M.

In the oral opinion given by this court on November 24, 1971, on the motion of the city defendants to dismiss, in Civil No. 71–1118, it was decided that all plaintiffs had standing to sue based on the case law as it existed at that time. Particular emphasis was given to the Fourth Circuit's decision in West Virginia Highland's Conservancy v. Island Creek Coal Co. et al., 441 F.2d 232 (4th Cir. 1971). Although at that time the Ninth Circuit's decision in Sierra Club v. Hickel, 433 F.2d 24 (9th Cir. 1970); cert. granted, 401 U.S. 907, 91 S.Ct. 870, 27 L.Ed.2d 805, ostensibly appeared to preclude proper standing to sue on the part of certain plaintiffs, reliance on that decision was questionable in light of the Supreme Court's grant of certiorari in that case.

Since the issuance of the opinion of this court on the issue of standing, the Supreme Court has reviewed and affirmed the Ninth Circuit's decision in its recent decision in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (April 19, 1972). Holding that the Sierra Club did not have standing, the Court based its decision on the fact that the Sierra Club failed to allege that it or its members would be affected in any way by any of the activities or actions which were being challenged. The Court reasoned the allegations of individualized injury were necessary even in suits involving so-called "public actions." The Court stated: "A mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved' within the meaning of the APA." 92 S.Ct. at 1368.

Unlike Sierra Club v. Morton, all organizational plaintiffs in this action, except the Natural Resources Defense Council, Inc., (NRDC) have alleged indi-

---

26. Defs J.E. No. 2, p. iv.

27. Ibid, p. v.

28. Ibid, p. iv; see also Exhibit No. 18, attached to federal defendants' motion.

29. Exhibit 18, attached to federal defendants' motion.

30. Defendants have submitted a transcript of the May 25, 1971, design hearing held on I–70N. Plaintiffs have objected to this transcript on the ground that it is irrelevant and immaterial to the issues involved. The objection is hereby overruled and the transcript is admitted as Defendants' Joint Exhibit No. 19.

vidualized injury to the organization and its members.

The complaint alleges that the Sierra Club is a non-profit corporation with a membership in excess of 130,000 members, divided into 34 local chapters in various parts of the country. The complaint further alleges, and proof was offered in support thereof, that the Potomac chapter, which is the chapter with jurisdiction over the geographical area including Baltimore, has a subdivision which is known as the "Greater Baltimore Group," a semi-autonomous body composed of individuals who are members of the national Sierra Club as well as of the Potomac chapter.[31] The Greater Baltimore Group is composed of at least 600 members in the Baltimore area and conducts its own program of outings and hikes. The local Group has conducted hikes and outings in Leakin Park and Gwynns Falls Park and has encouraged its members through its publication of a "Baltimore Trails Book" and otherwise to use these parks on individual excursions as well as on an organized basis.[32] The Greater Baltimore Group of the Sierra Club has also had at least one general meeting in Leakin Park.[33]

As to VOLPE, Inc., the complaint alleges that it is a nonprofit corporation with a membership of over 150 persons and that "[a]ll or nearly all of such persons have used and enjoyed such parks [i.e. Leakin Park and Gwynns Falls Park], intend and desire to continue to use and enjoy said parks, place a high value on their right to do so and will suffer an infringement and derogation of such right and irreparable damage if I–70N is constructed as presently planned." VOLPE, Inc. has jointly sponsored two outings in these parks with the Sierra Club [34] and one joint activity with the Maryland Kite Associa-

tion in the Crimea area of Leakin Park.[35] There was testimony that VOLPE, Inc. encouraged its members to enjoy the beauties and attributes of the two parks.[36]

Mr. Lyle W. Horn, a member of the Sierra Club and president of VOLPE, Inc.,[37] testified that the proposed expressway in any location through Leakin and Gwynns Falls Parks would adversely affect the activities of Sierra Club and VOLPE, Inc. and, in illustration, pointed to what he terms destruction of spectacular views which a bridge proposed on the northern alignment would cause.[38]

I believe that the allegations, and proof offered in support thereof, relating to Sierra Club and VOLPE, Inc. minimally meet the test of individualized injury set forth in Sierra Club v. Morton, *supra*, and accordingly hold these plaintiffs have standing.

As to NRDC, however, I find that it has not alleged the requisite injury to afford it standing to maintain an action in this proceeding. The only allegation made by it with any relation to injury is that it is "dedicated to preventing the unnecessary and unlawful destruction of the natural resources and human environment of the United States." This allegation, I believe and hold, is "a mere interest" in a problem and is insufficient to maintain standing. Accordingly, plaintiff NRDC will be dismissed from this proceeding for lack of standing.

Plaintiffs Sleightholm and Reeves have alleged individualized injury to themselves sufficient to give them each standing and have offered some evidence in support thereof.[39] This court is of the view that they have standing to sue. Sierra Club v. Morton, *supra*; Association of Data Processing Service Organi-

31. Tr. 73.

32. Tr. 73–76.

33. Tr. 76.

34. Tr. 78, 106–108.

35. Tr. 78–79; 108–109.

36. Tr. 79.

37. Tr. 71; 77.

38. Tr. 112–115.

39. Tr. 133–136; 139–141; 150–151; 152–154.

**1212**

zations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).

## II. Laches

 Defendants have also asserted that plaintiffs should be barred from maintaining this action under the doctrine of laches. Essentially the argument is that plaintiffs either knew or should have known that the 1962 hearing was the hearing upon which defendants relied to fulfill the requirements of 23 U.S.C. § 128 and that any action brought to challenge this hearing should have been brought within a reasonable time after that hearing. Civil Action No. 71–930–M was filed on August 26, 1971 and Civil Action No. 71–1118–M was filed on October 12, 1971.

 To sustain the defense of laches, proof of prejudice to the party asserting the defense together with an unconscionable delay by the party against whom the defense is asserted is required. Costello v. United States, 365 U.S. 265, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961). An unconscionable delay can occur only after a party discovers or by the exercise of reasonable diligence could have discovered the wrong of which he complains. E.g. Ute Indian Tribe of Uintah and Ouray Reservation v. Probst, 428 F.2d 491 (10th Cir. 1970), cert. den. Moosman v. Ute Indian Tribe of Uintah and Ouray Reservation, 400 U.S. 927, 91 S.Ct. 189, 27 L.Ed.2d 186. Whether laches bar an action in a given case depends upon the circumstances of the case and is a question primarily addressed to the discretion of the trial court. Burnett v. New York Cent. R.R., 380 U.S. 424, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965).

As to the question of prejudice, evidence was introduced at trial that substantial money and time have already been expended in the planning of, and

acquisition of land for, the I–70N project. Approximately $16,400,000 have been expended on various work related to the proposed I–70N route; right-of-way has been acquired and plans are nearing their final stages for construction. A change in plans at this late date, defendants contend, would be extremely detrimental in terms of both money wasted and delay created in completing the highway.

As to the second element of the laches defense, unconscionable delay, it would seem that the earliest date any action could have been instituted to protest the hearing would have been February 28, 1967, the date when the northern alignment was approved by defendant Ackroyd. This is so because until a location was approved it would be possible to have another public hearing which would unquestionably comply with the then requirements of 23 U.S.C. § 128. Thus 1967, *not* 1962 is the relevant year from which to measure laches under the former versions of 23 U.S.C. § 128 and PPM 20–8. As to the current provisions of 23 U.S.C. § 128 and PPM 20–8, common sense dictates that no cause of action could have arisen with respect to them until their enactment. Since both were not in force until mid-January, 1969, this date would be the relevant date in determining whether or not laches bar this suit.

It must also be noted that there is no evidence that plaintiffs *knowingly* sat on their rights and delayed bringing suit. Cf. Pennsylvania Environmental Council, Inc. v. Bartlett, 315 F.Supp. 238, 246 (M.D.Pa.1970). In fact, it appears that plaintiffs did not know until very recently that the 1962 hearing was to be relied upon as the federal location hearing on the current project.[40]

Under similar circumstances, the Fourth Circuit recently refused to dismiss on the ground of laches a suit brought by several individuals and civic

40. In a letter dated April 27, 1970 (Pl. Sierra Club's Exhibit No. 20), defendant Axelrod responding to plaintiff Sierra Club's position statement on I–70N through Leakin Park, represented that the June, 1967 hearing was "the first public hearing on Leakin Park."

groups, Arlington Coalition of Transportation v. Volpe, *supra.* Speaking on the subject of laches, Judge Craven said for the court:

" . . . [A]ppellees claim that appellants' suit should be barred by laches. Appellees as representatives of the general public and specific interest groups will be prejudiced by appellants' delay in bringing suit if the proposed route for Arlington I–66 is altered or abandoned. Most of the right-of-way for the proposed route has been acquired; Arlington County's planning with respect to zoning, traffic, and location of utilities has been based upon the route; and the location of numerous businesses has been chosen in reliance upon the route. Appellants could have brought suit earlier to minimize or avoid this harm; all of the relevant statutes were in effect by January 1, 1970, but appellant did not file suit until February 19, 1971. Nevertheless, we decline to invoke laches against appellants because of the public interest status accorded ecology preservation by the Congress. We believe that Arlington I–66 has not progressed to the point where the costs of altering or abandoning the proposed route would *certainly* outweigh the benefits that might accrue therefrom to the general public. In their reconsideration of the proposed route, the Secretary of Transportation and the Commissioner of the Virginia Department of Highways may decide, of course, that the costs do outweigh the benefits. If the opposite conclusion is a reasonable possibility, however, as it is here, the congressional declaration of policy in the relevant statutes of the importance of the benefits that might accrue demands that the merits of the question be considered by the appropriate agencies." (footnote omitted). Id. 458 F.2d at p. 1329.

In the *Arlington Coalition* case, the location hearings were held in October, 1958 and the location of the road was approved by the Federal Bureau of Public Roads in 1959. Extensive newspaper coverage was given the process of choosing the projected location of the proposed road in that case. The route finally selected had been shown on the Arlington County General Land Use Plan since 1961. The costs of land acquisition alone which had been expended by governmental authorities in reliance upon the route location exceeded $28,600,000 in addition to the costs of studies and engineering completed based on that route location. The route in *Arlington Coalition* was partially through two park areas, and a combined total of 14.6 acres of park area was to have been used in the construction of the road there in question. In addition a connecting road would have utilized 13.97 acres of park land.

On this record the Fourth Circuit in *Arlington Coalition,* without remanding the case to the trial court for further evidence or for a factual determination, nevertheless held that the road there in question had not met the test imposed for determining the validity of a defense of laches in a case involving ecology preservation which has been accorded a " . . . public interest status . . . by the Congress." *Ibid.*

Bound as this court is to follow the Fourth Circuit's apposite rulings, the *Arlington Coalition* case, a much stronger factual basis for the application of the defense of laches than the present one, dictates the denial of the respective defendants' motion on that ground. See also Harrisburg Coalition Against Ruin. Envir. v. Volpe, 330 F.Supp. 918 (M.D. Pa.1971).

III. *Sovereign Immunity*

Plaintiffs have asked this court to issue a permanent injunction in this action against the state defendants restraining and enjoining them, *inter alia,* " . . . from taking or continuing any action on behalf of the State of Maryland . . . in furtherance of the proposed construction of Segment 9 of I–70N, including without limitation, the solicitation of or advertising for bids

from any person, corporation or other entity and the awarding or execution of contracts for construction of Segment 9 of I–70N or portions thereof . . . ." The state defendants have raised the defense of sovereign immunity as an absolute bar to this action.[41] Thus the issue arises whether a state that applies for federal highway aid, and is accepted for and participates in the federal highway aid program, pursuant to 23 U.S.C. § 101 et seq., may successfully plead sovereign immunity in a federal court suit brought against it and the federal government for alleged noncompliance with various federal enactments setting conditions on the availability of that federal aid.

■ The Eleventh Amendment provides:

"The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

This has been interpreted to mean that an unconsenting state is immune from federal court suits brought by its own citizens as well as citizens from another state. Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Under this amendment, a state is not divested of its immunity "on the mere ground that the case is one arising under the constitution or laws of the United States." Parden v. Terminal R.R., 377 U.S. 184, 186, 84 S.Ct. 1207, 1209, 12 L. Ed.2d 233 (1964). But the immunity may be waived; the state's freedom from suit without its consent does not protect it from a suit to which it has consented. Parden v. Terminal R.R., supra; Petty v. Tennessee-Missouri Bridge Comm., 359 U.S. 275, 79 S.Ct.

785, 3 L.Ed.2d 804 (1959); Chesapeake Bay Bridge & Tunnel Dist. v. Lauritzen, 404 F.2d 1001 (4th Cir. 1968). The "conclusion that there has been a waiver of immunity will not be lightly inferred." Petty v. Tennessee-Missouri Bridge Comm., supra, 359 U.S. at p. 276, 79 S.Ct. at p. 787.

At the outset, this court concluded that since the action against the state defendants here is in fact and in law one against the state, the defense of sovereign immunity can be raised by these defendants as a defense to the action. See In re Ayers, 123 U.S. 443, 8 S.Ct. 164, 31 L.Ed. 216 (1887); Elliot v. Volpe, 328 F.Supp. 831 (D.Mass.1971). The only question before this court is whether immunity has been waived.

■ It is true in suits for damages, such as in the Petty and Parden cases, waiver of immunity will not be found unless there is clear and explicit language to that effect. In suits for damages where a state has entered into an area regulated by federal statutes, such as the field of navigation in the Lauritzen case, a waiver may be implied when the claimant is a member of the class intended to be protected by the statute and when that statute gives him a cause of action. See Citizens Committee for Hudson Valley v. Volpe, 297 F.Supp. 809, 813 (S.D.N.Y.1969), discussing Lauritzen, supra. Such situations have generally been held to be the only instances when a state will be found to waive its immunity.

■ However, in determining whether or not a state has waived its immunity I believe that a distinction should be made between suits for damages, where one seeks an affirmative judgment against the state, and suits for injunctive relief or similar relief, where one seeks to restrain the state from

---

41. The state defendants' sovereign immunity defense was also raised in a case pending before Judge Roszel C. Thomsen, Lukowski v. Volpe, Civil No. 20634 (D. Md.). Judge Thomsen and I, sitting together, jointly heard arguments of counsel on this defense. Judge Thomsen has authorized me to state that he has read the section of this opinion on the issue of sovereign immunity and concurs with the conclusions reached therein.

doing or performing a particular action. In the latter case I believe that the defense of immunity should yield more readily where the issue sought to be litigated is the compliance or noncompliance by the state with the preconditions set forth in a federal statute or regulation for the enjoyment by the state of federal aid for the specific project for which the state has applied for the aid. In seeking the federal aid the state has necessarily agreed to be bound by the terms of the federal statutes and regulations which govern the availability and disposition of the federal aid. Where there is proper standing, it is beyond cavil that a citizen generally may sue federal agencies in the federal courts when administrative decisions have been made by federal officials in violation of federal law, Sierra Club v. Morton, *supra*; Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 at 410–413, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Association of Data Processing Service Organizations, Inc. v. Camp, *supra*, 397 U.S. at 156–158, 90 S.Ct. 827; Barlow v. Collins, *supra*, 397 U.S. at 165–167, 90 S. Ct. 832. In a case of this type, involving as it does the question of compliance by state and federal officials with the federal law regulating the eligibility of the state for federal financial aid on a specific highway project, the federal government and the state and city governments are inextricably connected together in the building of the highway. It would seem futile to allow relief against the federal defendants and, on the other hand, preclude the plaintiffs, if relief is otherwise appropriate, from obtaining relief against the state defendants when the ultimate object is to insure that federal money is paid to and utilized by the state in accordance with the federal law regulating such payment and use.

Recently, in Arlington Coalition of Transportation v. Volpe, *supra*, the Fourth Circuit dealt with the question of whether or not the Commissioner of the Virginia Department of Highways was subject to federal jurisdiction since the challenged activities of his depart-ment—condemnation of right of way and eviction of the landowners—are authorized by state law and could be carried out independently of the highway project under consideration. Rejecting these contentions of Virginia, the court stressed the close relationship between the state and the federal government in constructing the road and the undesirable effect the state's independent action could have on any future judicial or administrative decisions. Judge Craven for the court said:

" . . . these activities [state activities] would not in fact be independent of this project. See Named Individual Members of the San Antonio Conservation Society v. Texas Highway Department, 446 F.2d 1013, 1028 (5th Cir. 1971); Morningside-Lenox Park Association v. Volpe, 334 F.Supp. 132, 146 (N.D.Ga.1971). Appellee Fugate does not suggest that the Commonwealth of Virginia no longer seeks to build this highway with federal funds. If we were to find—as we do—that federal law requires that the proposed route . . . be reconsidered, acquisition by the state of right-of-way along the proposed route during the reconsideration would make proceeding with the proposed route increasingly easier and, therefore, a decision to alter or abandon the route increasingly undesirable. Thus the challenged activities of the state highway department would make a sham of the reconsideration required by federal law. Action of a state highway department, challenged because furthering a project that under federal law allegedly must be reconsidered, is a matter in controversy arising under the laws of the United States. Federal jurisdiction over such state action is essential to preserve federal question jurisdiction in the application of federal statutes. It is a form of pendent (sic) jurisdiction, but based upon necessity rather than convenience and limited to preventing emasculation of remedy clearly available against the federal re-

spondents." [footnote omitted]. 458 F.2d p. 1329.

Although the issue of sovereign immunity was not specifically raised in *Arlington Coalition,* I believe that the rationale of that decision is essentially the same as that applicable to the defense of sovereign immunity in this case. This court holds that when a state applies for and accepts federal aid highway funds, it can be deemed to have waived its immunity from suit under the Eleventh Amendment, at least as to a suit for injunctive or other relief designed to enforce the provisions of federal law which establish the conditions under which the federal aid can be distributed to or obtained by the state.

## IV. *Notice of 1962 Hearing*

Plaintiffs have alleged that the 1962 hearing held at Eastern High School does not satisfy the hearing requirements of 23 U.S.C. § 128 and PPM 20–8 which were in existence at that time.

Section 128 did not (nor does it now) itself explicitly set forth any notice requirements with regard to public hearings held pursuant to it. PPM 20–8, which went into effect June 16, 1959 and was still in effect at the time of the 1962 hearing (hereafter referred to as PPM 20–8 (1959)), did establish, however, standards for notifying the public of hearings held pursuant to section 128. This notice requirement is found in section 4(b) which reads:

"b. Reasonable advance notice must be given of scheduled public hearings or of the opportunity therefor, and the purpose thereof. Such notice shall include either a description or some specific identification of the proposed route or routes to be discussed. The notice shall be published at least once each week for two successive weeks in a newspaper having general circulation in the vicinity of the proposed project and shall also be publicized through other means, such as news releases to newspapers and radio and television stations, so as to provide reasonable assurance that the notice will come to the attention of all interested or affected persons. The use of graphic illustrations is desirable though not necessarily required. Reasonable advance notice of the location, date and time of each such public hearing should be supplied to the Bureau's division engineer."

The notice of the 1962 hearing stated that a hearing on the proposed location of I–70N would be held in ". . . the auditorium of Eastern High School, located on 33rd Street opposite the Memorial Stadium on Tuesday, January 30, 1962, at 7:30 P.M. Eastern standard time." It was published on January 15 and 22, 1962 in the *Baltimore Sun* and *Evening Sun,* the *Baltimore News-Post,* and the *Daily Record,* daily newspapers of general circulation in the City of Baltimore. Although the notice did not contain any graphic illustration of the proposed location, it did contain the following description of the East-West Expressway (I–70N) route under consideration:

"The East-West Expressway will begin at a point on the Western City Boundary, about 0.6 mile north of Edmondson Avenue and extend easterly through the City, passing reasonably close to the downtown area, and terminating at the Northeastern Expressway near the Eastern City Boundary . . . . .

\* \* \* \* \* \*

"In the engineering report recently prepared on the selection of the Expressway routes, the recommended route for the East-West Expressway approaches the downtown area in a corridor between Franklin and Mulberry Streets, to a point west of Fremont Avenue, then proceeds southerly to the vicinity of Hamburg Street, where it turns eastward along Hamburg Street, crossing the Inner Basin northwest of Federal Hill. It then proceeds easterly along the north shore of the Patapsco River and Boston Street to a point near the Eastern City Boundary, where it turns north-

ward to connect with the Northeastern Expressway."

The notice concluded with a statement that interested persons from these affected areas would be heard particularly with reference to the economic effect of such location and that any further information desired prior to the hearing regarding the proposed improvement could be obtained by application to the Director of Public Works, 300 Municipal Building, Baltimore, Maryland.[42]

While this court concedes that the route description is not crystal clear, and does not specifically mention the parks involved in this case, I believe, nevertheless, that reasonable advance public notice was provided to the public of the hearing and its subject matter. A person living in the areas affected could from the description given without undue difficulty discern the approximate location of the proposed route and the fact that it would probably pass through Leakin and Gwynns Falls Parks. Even if the exact corridor described could not be determined precisely from the advertisements, one could, if interested, have obtained more exact information very easily from the Department of Public Works.

Moreover, the transcript of the hearing indicates that a very large number of persons and organizations attended the hearing and expressed their views about the proposed route and their opposition to the utilization of park land for I–70N. These people voiced their objections to the southern alignment through the park as well as to any route through the park at all. Plaintiffs have not indicated any additional information that was not submitted at the hearing as a result of the alleged deficiency of the notice nor have they pointed to a single instance in which an interested party was deprived of an opportunity to be heard. To be sure, plaintiffs argue that it is impossible to determine how many people might have appeared at the hearing if the notice had more specifically

delineated Leakin Park and Gwynns Falls Park as part of the proposed route for the road. It is pure speculation, however, to say that any other persons would have appeared to testify at the hearing if the notice had been worded differently. The hearing here is of a nonadjudicatory, quasi-legislative nature. *See* Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 414–415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). There was substantial compliance with the intent of the statute and PPM 20–8 (1959) relating to notice, and a fair opportunity was given to any persons interested to become aware of the hearing and of the fact that it afforded them a chance to comment upon the relative merits or demerits of Leakin and Gwynns Falls Parks as a site for the construction of a portion of I–70N This is all that was required. *See* Citizens to Preserve Overton Park, Inc. v. Volpe, 432 F.2d 1307, 1314–1315 (6th Cir. 1970); rev. on other grounds, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *see also* Nashville I–40 Steering Committee v. Ellington, 387 F.2d 179 at 183–184 (6th Cir. 1967), cert. den. 390 U.S. 921, 88 S.Ct. 857, 19 L.Ed.2d 982 (1968); 5 U.S.C. § 706.

V. *Adequacy of 1962 Hearing*

Even though the notice of the 1962 hearing was legally adequate to notify interested persons of the fact that a hearing was to be held on the proposed location of a road through Leakin and Gwynns Falls Parks, the hearing itself was legally insufficient to support location approval of the route of I–70N through Leakin and Gwynns Falls Parks in the alignment now proposed.

Title 23, U.S.C. § 128, as it was in effect from 1958 to 1968, provided in pertinent part as follows:

"(a) Any State highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town, or village, either incorpo-

---

42. For the complete text of the notice, see Loc. tr. 5–7.

rated or unincorporated, shall certify to the Secretary that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic effects of such a location."

On June 16, 1959, the Bureau of Public Roads of the U. S. Department of Commerce promulgated PPM 20–8 (1959), purporting to interpret and implement 23 U.S.C. § 128. Although the statute did not define the meaning of the word "location" as used in connection with the public hearing requirement, PPM 20–8 (1959) made it clear that the hearing was required to be held after a general location for the proposed road had been decided upon by the appropriate State highway department but before detailed centerline location of the road was finally determined. The objectives of the public hearing required under § 128 were stated by PPM 20–8 (1959) as follows:

"2.

"a. The *responsibility for the selection or designation of Federal-aid highway routes rests with the State highway departments,* as provided by Section 103. The authority to approve such State action is vested in the Secretary of Commerce, who has delegated such authority to the Federal Highway Administrator. There is *no requirement under Title 23, U.S.C., that there be a public hearing as a part of a State's action in selecting or designating a Federal-aid highway route,* nor for any approval of such action by the Federal Highway Administrator.

"b. *Section 128 requires that there be a public hearing, or that there be opportunity afforded for one, prior to the time that a State highway department may proceed with certain Federal-aid projects* for the improvement of previously selected or designated Federal-aid highway routes.

"c. The *objective of the public hearings is to provide an assured method whereby the State can furnish to the public information concerning the State's highway construction proposals, and to afford every interested resident of the area an opportunity to be heard* on any proposed Federal-aid project for which a public hearing is to be held. At the same time *the hearings afford the State an additional opportunity to receive information from local sources which would be of value to the State in making its final decision as to which of possibly several feasible detailed locations should be selected.*

"d. The *hearings are not intended to be a popular referendum for the purpose of determining the location of a proposed improvement by a majority vote of those present. They do not relieve the duly constituted officials of a State highway department of the necessity for making decisions* in State highway matters for which they are charged with full responsibility. The *public hearing procedure is designed to insure the opportunity for or the availability of a forum to provide factual information which is pertinent to the determination of the final location considered by the State to best serve the public interest* and on which improvement projects are proposed to be undertaken." (Emphasis supplied).

PPM 20–8 (1959) provided in Paragraph 4.a as follows:

"a. Public hearings required by Section 128 should be held *before the specific location* of a proposed project *is selected,* but *not until after* the State highway *department has selected a corridor location from among the alternates studied,* and has developed preliminary plans in sufficient detail to enable the public and the State to consider and discuss the principal features of the proposed project at the public hearing." (Emphasis supplied).

According to Paragraph 5.c., only after the hearing had been held and the Division Engineer of the Bureau of Public Roads was ". . . satisfied that the

requirements of Section 128 and this memorandum have been fulfilled [43] . . . " could the Division Engineer ". . . approve the location and authorize the State to proceed with the development of plans, rights-of-way acquisition, and the actual construction . . . . "

One of the problems in this case is that the meaning of the term "corridor" has been deemed to be critical in the determination of whether § 128 has been complied with. If one thing is clear from the evidence, it is that the word "corridor," as used by highway planners and engineers, far from being a precise term, can mean many things depending upon the context. Generally, there seems to be apparent agreement that it means a broad band of land of generally similar characteristics within which a particular highway may be located. The size or width of the "corridor," however, depends upon the context within which the word is used. For instance, in the January 30, 1962 hearing, the word "corridor" was used to describe the very broad general idea of a road to the north of the central business area of the city (northern corridor) as opposed to the equally broad general idea of a road to the south of the business district (southern corridor).[44] Within the southern corridor in that context, were many other corridors, much smaller in breadth and limited by their respective contexts, such as the Hamburg street corridor,[45] the Pratt-Camden corridor,[46] the Freemont corridor,[47] etc. There was testimony that the Expressway Consultants in 1961 considered all of Leakin and Gwynns Falls Parks to be a single corridor for highway planning purposes,[48] the generally similar circumstances of the band of land there being its use for park purposes, its ownership by the public and its circumferential residential development. In another context, the Concept Team considered that there were ". . . three alternative corridors within Leakin/Gwynns Falls Parks . . . ." [49]

As a result of the myriad meanings of "corridor," the use of that term in Paragraph 4.a. of PPM 20–8 (1959) is of little help by itself in determining at what stage in the highway planning process the location hearing was required to be held. Perhaps the best clue is found in Paragraph 2.c., PPM 20–8 (1959), which states that a purpose of the hearing is to aid the State in making its *final* decision as to *which* of several feasible *detailed locations* should be selected. This language is particularly significant when Paragraph 3.b. of PPM 20–8 (1959) is read which requires that the State highway department ". . . fully inform the public concerning the *general location and design features,* and the general economic and other aspects of the proposed improvements *together with possible alternate routes,* all *in sufficient detail* to permit residents of the area to have full and reliable information as to the project." (Emphasis supplied). When PPM 20–8 (1959) is read in its entirety, as a whole, it appears that the hearing was required to be held after the route in question had been narrowed to a relatively meaningful area, but before a detailed location had been chosen from feasible alternatives. Paragraphs 2.c. and 3.b. of PPM 20–8

43. In the view this court takes of the case, it is not necessary to decide whether PPM 20–8 (1959) required the certification of the State highway officials that they considered the economic effects of the location to be filed before the Division Engineer could approve the location.

44. Loc. tr. 25–28. The generally similar circumstances of the band of land comprising the northern corridor were (1) proximity to and influence of Baltimore City and (2) location north of the Baltimore central business district. The band of land comprising the southern corridor had the same generally similar circumstances except it was located south of the Baltimore central business area.

45. Loc. tr. 30.

46. Loc. tr. 31.

47. Loc. tr. 31.

48. Tr. 198–199, 266.

49. Defs J.E. No. 2, p. 14.

(1959) clearly contemplated that the feasible alternative specific locations of the proposed road within the corridor must fairly be submitted to the public for comment at the hearing.

There is considerable evidence in this case that the State and City highway planners and officials considered Leakin and Gwynns Falls Parks to be a corridor when the January 30, 1962 hearing took place. Assuming that this is so and that the Leakin and Gwynns Falls Parks corridor had been formally or practically chosen as the corridor for the road by the time of the 1962 hearing,[50] there still must be answered the question of whether the alternative feasible specific locations within the corridor were fairly presented to the public in order that reasonable opportunity existed for comments thereon at the hearing.

All twenty alternative routes for I-70N which were presented as study locations by Expressway Consultants in 1962 included the southern alignment through Leakin and Gwynns Falls Parks.[51] The map entitled "Study Lines," marked Plate VII of the consultant's report which was the basis of the hearing, showed only the so-called southern alignment through Leakin Park although it did show variations of routes through the northern area of Gwynns Falls Park.[52] The text of the consultant's report stated that unspecified alternate study lines minimizing the taking of property in Leakin Park were studied but rejected in view of their damages to residential neighborhoods in the area ". . . plus the fact that the park property affected would chiefly be in the southern portion of the park in rugged terrain which is not adaptable for recreational purposes and in which a landscaped expressway would be compatible." [53]

Although the engineering feasibility of a more northerly alignment through Leakin Park was acknowledged by the consultants in December, 1961, no effort was made to include this or any other more northerly alignment through the Park as a specific alternative location upon which public comment was formally invited.[54] Those persons who opposed the project as presented in reference to Leakin Park voiced objections either to any expressway through the park or to the so-called southern alignment. Although several persons expressed a vague preference for a more northern alignment through Leakin Park, there were no graphic or other illustrations available to present the northern alignment as a specific alternative.

The Supreme Court has described the function of a § 128 hearing as follows:

"And the only hearing that is required by either the Administrative Procedure Act or the statutes regulating the distribution of federal funds for highway construction is a public hearing conducted by local officials for the purpose of informing the community about the proposed project and eliciting community views on the design and route. 23 U.S.C. § 128 (1964 ed., Supp. V). The hearing is nonadjudicatory, quasi-legislative in nature. It is not designed to produce a record that is to be the basis of agency action—the basic requirement for substantial-evidence review. See H. R. Rep. No. 1980, 79th Cong., 2d Sess." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. at 414–415, 91 S.Ct. at 823.

50. There is doubt that the so-called Leakin-Gwynns Falls Park Corridor had been formally chosen by that time since it was not until October 7, 1963 that the Division Engineer of the Bureau of Public Roads, pursuant to requests of the State Roads Commission commencing in August, 1963, approved "broad traffic corridors" for I-70N. See Exhibit 8, attached to federal defendants' motion.

51. Exhibit 2, Vol. I, attached to federal defendants' motion, pp. 36–55.

52. Id. plate VII.

53. Id. p. 28.

54. Loc. tr. 118–119.

While there need not be substantial evidence adduced at the hearing to support the ultimate decisions of the government officials charged with the responsibility of deciding upon a route for the road, there must be substantial compliance with the procedures established by statute and regulation to provide a meaningful and informed opportunity for public participation in the process.

There apparently is a significant difference between the northern and southern alignments in Leakin Park. Expressway Consultants felt there was a difference in 1961 when they based their choice of the Leakin Park corridor partially on what was considered to be the less damaging aspects of the southern alignment.[55] The northern alignment is, at certain points, physically located approximately one-half mile to the north of the southern alignment. The acoustical effects of the two routes are different as are the visual impacts.[56] Without intending to express any opinion as to the relative merits of either alignment, this court, based on the evidence adduced in this proceeding, finds that there is a significant difference between the two alignments, both in terms of general potential effects upon the park itself and upon the members of the public who reside to the north and south of Leakin Park and Gwynns Falls Park. *Cf.* D.C. Federation of Civil Associations et al. v. Volpe, 316 F.Supp. 754 at 778–781 (D.D.C.1970); reversed and remanded, 459 F.2d 1231 (D.C.Cir. 1971).

Since the two alignments are significantly different, there was not substantial compliance with PPM 20–8 (1959) if the January 30, 1962 hearing is the basis for detailed centerline approval of the northern alignment through the two parks in question.

■ Since it appears that the 1959 and prior versions of PPM 20–8 were not published in the Federal Register, the defendants have argued that the PPM might not be applicable to the 1962 hearing and decisions purportedly based

thereon prior to the revisions to PPM 20–8 promulgated and published in 1969. While literal compliance might not be necessary, as previously indicated, substantial compliance with the statute, as interpreted in the case of ambiguity by the agency charged with the responsibility for enforcing compliance, Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L. Ed.2d 616 (1965), is required.

In addition, in Nashville I–40 Steering Committee v. Ellington, 387 F.2d 179 (6th Cir. 1967), cert. den. 390 U.S. 921, 88 S.Ct. 857, 19 L.Ed.2d 982 (1967), when the court was considering whether a 1957 public hearing had complied with applicable federal requirements, it referred to the 1956 unpublished version of PPM 20–8 as a "regulations of the Bureau of Public Roads . . . ." In Service v. Dulles, 354 U.S. 363, 77 S. Ct. 1152, 1 L.Ed.2d 1403 (1957), the Court held that the Department of State was bound by certain regulations set forth in its Manual of Regulations and Procedures but not published in the Federal Register. In Citizens to Preserve Overton Park, Inc. v. Volpe, *supra*, the Court considered an executive order issued by the Secretary of Transportation (which order has never been published in the Federal Register or elsewhere) to "constitute[s] the law in effect at the time of our decision . . . ." 401 U.S. at 419, 91 S.Ct. at 825.

For all the above reasons this court reluctantly reaches the conclusion that the 1962 hearing did not comply with § 128, as interpreted by PPM 20–8 (1959).

VI. *Location Approval on February 28, 1967.*

On February 28, 1967, defendant Ackroyd, in response to a request of February 23, 1967, gave detailed centerline location approval to the northern alignment route location for I–70N through Leakin and Gwynns Falls Parks. In granting this approval, he determined that the requirements of 23 U.S.C. § 128 and PPM 20–8 (1959) had been satisfied. The only public hearing relied on

---

55. See also Loc. tr. 212–213, 215–216.

56. Defs J.E. No. 2, pp. 15–16.

in making this determination was the 1962 hearing. The letter containing that approval stated, *inter alia*, that "[P]ublic Hearings were held on *a location* delineated in a report on 'Interstate Highways 70N and 95' prepared for the Department of Public Works, City of Baltimore, by Expressway Consultants . . . . Subsequent controversy developed over *the location* shown in Leakin Park. *The location* you have submitted appears to have resolved many of the differences . . . ." (Emphasis supplied).

As determined in Section V of this opinion, the 1962 hearing did not substantially comply with the law then in effect and did not provide a fair opportunity for comment by the public on the location ultimately chosen. Therefore, the detailed centerline approval was without legal effect.

VII. *Adequacy of 1967 Hearing*

█ In Baltimore City, the Mayor and City Council may not exercise the right of eminent domain without the passage of an ordinance by the City Council authorizing the condemnation.[57] In order to construct the so-called northern alignment through Leakin and Gwynns Falls Parks, a few parcels of privately owned land were required to be obtained west of Hilton Parkway and east of the western city boundary.[58] These parcels were located (1) immediately east of the west city boundary, north of Cooks Lane and south of Franklintown Road, and (2) in an area south of Windsor Mill Road in the general vicinity of Hilton Avenue.[59] There were a great many privately owned parcels to be acquired east of Hilton Parkway.[60]

The hearing of July 1, 1967 purported to be for the two-fold purpose of complying with the legislative process required under Baltimore City local law for the passage of the required condemnation ordinance and of complying with § 128 and PPM 20–8 (1959) requiring a "location" hearing.[61]

The notice which purported to satisfy the notice requirements of PPM 20–8 (1959) [62] read in relevant part as follows:

"MAYOR AND CITY COUNCIL
OF BALTIMORE

DEPARTMENT OF PUBLIC WORKS
BUREAU OF HIGHWAYS

PROPOSED CONSTRUCTION
OF PUBLIC HIGHWAY

"All interested persons are hereby advised that construction of Interstate Highway I–70N from Pulaski Street to Hilton Parkway and including the area in the vicinity of Windsor Mill Road—Hilton Avenue and Vicinity of West City Boundary—northeast of Cooks Lane is planned by the Mayor and City Council of Baltimore. A Public Hearing regarding the said improvements will be held by the Judiciary Committee of the Baltimore City Council at the same time and place as the hearing to be held on pending Ordinance No. 1845. Said hearings to be conducted by the Judiciary Committee in the City Council Chambers on Thursday, June 1, 1967 . . . . .

. . . . . .

"All persons wishing to be heard on said matters are hereby notified to be present at said hearing.

* * * * * " [63]

A map was available at the hearing showing the northern alignment through Leakin and Gwynns Falls Parks. A brief description of the route through

---

57. Baltimore City Charter, art. II(2) (1964 Revision).

58. Ordinance No. 1058, approved June 26, 1967, authorized the condemnation of the private property near Leakin Park needed for the construction of I–70N.

59. See map attached to Defs J.E. No. 6.

60. Ibid.

61. Defs J.E. No. 6, pp. 6–11.

62. Ibid., pp. 7–8.

63. Defs J.E. No. 5A.

the two parks was made by an official of the Department of Public Works.[64] The record of the hearing contains a statement on behalf of the Board of Recreation and Parks approving the northern alignment and expressing the intention of the Department of Recreation and Parks to transfer the necessary park property of the Department of Public Works.[65] Except for plaintiff Ward, no one else at the hearing, which took place several hours in two stages, referred in specific terms to the park route. Most of the comments at the hearing by members of the public were directed to the condemnation of their respective properties east of the park areas. Ward, however, appeared at the hearing and expressed opposition to the East-West Expressway in general and to any alignment through Leakin and Gwynns Falls Parks in particular.

It might well be that the 1967 hearing, either alone or considered together with the 1962 hearing, would have substantially complied with the version of PPM 20–8 and § 128 then in effect. On the other hand, it is clear that the notice of the 1967 hearing did not specifically refer to Leakin Park and it could be argued that the notice specifically referred *only* to the location of a proposed road on the privately owned property which was required to be condemned. Other arguments could be that there was not sufficient preliminary design information provided to the public in connection with the second hearing to comply with PPM 20–8 (1959). Although at trial counsel for defendants indicated that they relied upon the 1967 hearing as one which would support a final location decision under § 128 and PPM 20–8 (1959), they have not argued this position in their post trial brief and apparently have abandoned it.

In view of this court's finding in Part VIII of this opinion that a new hearing will be required in any event, the court

has determined to resolve its doubts on the subject by finding that the 1967 hearing did not substantially comply with 23 U.S.C. § 128 nor with PPM 20–8 (1959). Both the 1959[66] and the 1969[67] versions of PPM 20–8 express a philosophy or requiring a "location" hearing whenever there is doubt. In addition it is in the public interest to eliminate confusion and uncertainty, possibly giving rise to further litigation, as to whether or not the 1967 hearing would qualify as a "location" hearing upon which subsequent decisions or reaffirmation and evaluation of prior decisions could legally be based by the state and city highway officials in finally approving a detailed location for Segment 9 of I–70N.

## VIII. *Additional Hearings Required*

In 1968 and 1970, 23 U.S.C. § 128 was amended to its present form. Previously § 128(a) had required only that a public location hearing seek information to aid in the consideration of the *economic* effects of that location. Now § 128(a) provides as follows:

"128. Public hearings

"(a) Any State highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town, or village, either incorporated or unincorporated, shall certify to the Secretary that it *has had public hearings*, or has afforded the opportunity for such hearings, and has *considered the economic and social effects* of such a location, its *impact on the environment,* and *its consistency with the goals and objectives of such urban planning* as has been promulgated by the community . . . *Such certification shall be accompanied by a report which indicates the consideration given to the economic, social, environmental, and other effects of the plan*

---

64. Defs J.E. No. 6, pp. 19–20.

65. Ibid., pp. 20–22.

66. PPM 20–8 (1959), paragraph 3.c., p. 2.

67. PPM 20–8 (1969), paragraph 7.d., pp. 3–4.

*or highway location or design and various alternatives which were raised during the hearing or which were otherwise considered."* (Emphasis supplied).

In 1969, PPM 20–8 was also amended. Most significant among the many changes made in PPM 20–8 was the requirement that two hearings, a "corridor public hearing" and a "highway design public hearing,"[68] be held by the State instead of one as previously required.

Since no legally effective hearing was held under § 128 or PPM 20–8 (1959), Paragraph 6.a of PPM 20–8 (1969) requires that both a corridor public hearing and a design public hearing be held. The design public hearing has already been held on May 25, 1971, pursuant to a ruling by the Division Engineer that PPM 20–8 (1969) required a design hearing for Segment 9 of I–70N. The design hearing fully met the technical requirements of PPM 20–8 (1969) and will not be required to be repeated unless after a corridor public hearing has been held or an opportunity afforded for such a hearing, the route location or design for which location or design approval are sought are so changed from the locations and designs which were the subject of the highway design public hearing of May 25, 1971 as to have a substantially different social, economic, and environmental effect.[69]

Even if this court were to hold that there had been legally effective and valid location approval of Segment 9 of I–70N either in February, 1967 based on the 1962 hearing or at some subsequent time based on the June, 1967 hearing, the practical result would not be substantially different in view of the doctrines expressed by the Court of Appeals for the Fourth Circuit in Arlington Coalition of Transportation v. Volpe, *supra.*

In *Arlington Coalition,* I–66 had, based on a 1958 location hearing, received location approval in 1959 prior to the effective date of revised PPM 20–8 (1969). The court recognized that the provisions of PPM 20–8 (1969) relating to location approval were not applicable to such a situation. 458 F.2d p. 1337, fn. 7. Independent of PPM 20–8 (1969), however, the Fourth Circuit in *Arlington Coalition* declared that the Virginia highway authorities were required to comply with the 1968 amendments to 23 U.S.C. § 128(a) by holding an additional public location hearing and reconsidering prior location decisions even though the pre-1968 hearing requirement of § 128(a) had been complied with in 1958,

68. PPM 20–8 (January 14, 1969), 23 C.F.R. Part 1, Appendix A, defines these hearings under sections 4(a) and (b) as follows:

"4. DEFINITIONS (As used in this PPM)

"a. A 'corridor public hearing' is a public hearing that:

"(1) Is held before the route location is approved and before the State highway department is committed to a specific proposal;

"(2) Is held to ensure that an opportunity is afforded for effective participation by interested persons in the process of determining the need for, and the location of, a Federal-aid highway; and

"(3) Provides a public forum that affords a full opportunity for presenting views on each of the proposed alternative highway locations and the social, economic, and environmental effects of those alternate locations.

"b. A 'highway design public hearing' is a public hearing that:

"(1) Is held after the route location has been approved, but before the State highway department is committed to a specific design proposal;

"(2) Is held to ensure that an opportunity is afforded for effective participation by interested persons in the process of determining the specific location and major design features of a Federal-aid highway; and

"(3) Provides a public forum that affords a full opportunity for presenting views on major highway design features, including the social, economic, environmental, and other effects of alternate designs."

69. See PPM 20–8 (1969), paragraph 7.c., p. 3.

the vast majority of all required right-of-way had been acquired at a cost in excess of $28,670,000,[70] and numerous business and governmental decisions had been made in reliance upon the approved location of the road.

This result concerning I–66 in Arlington County, Virginia was reached by the Fourth Circuit in sole reliance on the National Environmental Policy Act of 1969 (NEPA). For the court, Judge Craven stated:

"We think that the requirements *added to Section 128(a) apply to a highway ongoing at the effective date of the amendment if the costs of altering or abandoning the proposed location would not certainly outweigh whatever benefits might be derived therefrom.* Our conclusion is compelled by the congressional directive in Section 102 of the National Environmental Act (42 U.S.C.A. § 4332) that 'to the fullest extent possible . . . public laws of the United States shall be interpreted and administered *in accordance with the policies'* set forth in the declaration of policy of the Act (42 U.S.C.A. § 4331) . . .. Arlington I–66 has not yet reached the critical stage of completion. It is distinguishable, therefore, from those highways actually under construction to which Section 128(a) as amended was held inapplicable. Wildlife Preserves, Inc., *supra* (3 Cir., 443 F.2d 1273); Elliot, *supra* (Elliot v. Volpe, D.C., 328 F.Supp. 831). Our

case is distinguishable also from Triangle Improvement Council v. Ritchie, 314 F.Supp. 20 (S.D.W.Va.1969), aff'd 429 F.2d 423 (4th Cir. 1970) (per curiam decision), cert. dismissed, 402 U.S. 497, 91 S.Ct. 1650, 29 L.Ed. 2d 61 (1971), in which the effect of the National Environmental Policy Act upon the hearing requirement of Section 128(a) was not considered." 458 F.2d at p. 1337.

The present posture of Segment 9 of I–70N is not further toward completion of the highway project than was I–66 in *Arlington Coalition*. Substantial planning has been completed, a large proportion of the required right-of-way has been acquired and over $16,000,000 have been expended in reference to Segment 9. As in the case of I–66, P.S. & E. approval has not yet been obtained, construction contracts have not been awarded, nor, of course, has construction begun. Based on the Fourth Circuit's finding under essentially identical circumstances, this court is required to find that " . . . the costs of altering or abandoning the proposed location would not *certainly* outweigh whatever benefits might be derived therefrom" and therefore a new public location hearing would be required to be held seeking information on at least the social effects of the proposed location, its impact on the environment and its consistency with Baltimore's urban planning goals, all in compliance with the current policy expressed by § 128(a).[71]

---

70. The opinion recites that 84.4 percent of all necessary right-of-way, 93.9 percent of all necessary dwellings, and 98.5 percent of all necessary businesses had been acquired. 450 F.2d 1328.

71. While bound by the test, I respectfully must disagree with the test established by the Fourth Circuit in *Arlington Coalition* for determining when a project has reached the critical stage of completion beyond which the revisions to 23 U.S.C. § 128(a) do not apply. Without remanding the case for a factual determination, the Fourth Circuit panel in *Arlington Coalition* determined on un-

known facts by unknown criteria that "the costs of altering or abandoning the proposed location would not certainly outweigh whatever benefits might be derived therefrom." Such a standard is vague, subjective and extremely difficult to apply unless it means that the costs of changing would never outweigh the benefits of changing. In this case, the problem of application of the standard has been alleviated somewhat because of the great factual similarity of the relevant circumstances here with those in *Arlington Coalition*. If anything, I–66 had progressed substantially further toward completion than has Segment 9 of

*Arlington Coalition* also requires that a new public location hearing, even if a prior valid hearing has already been held, seek information on economic effects of the proposed road location caused by circumstances which were not reasonably anticipated at the time of any prior valid location hearing. 458 F.2d at 1337–1338. The fact that experts have studied and considered any such unanticipated circumstances and that the responsible governmental officials, knowing the results of the expert studies and considerations, reaffirmed their choice on numerous subsequent occasions is not determinative. The court said:

"Section 128(a) requires that included in the information considered in evaluating the economic effects of a highway must be information obtained at a public hearing. Study by experts is not the equivalent of a public hearing, and continuing evaluation of the economic effects of Arlington I–66 based only on such study is, therefore, not consideration within the meaning of the statute." Ibid 458 F.2d at 1338.

Defendants have attempted to sidestep the impact of the *Arlington Coalition* decision by reading it to hold that where a design hearing has been held and the environmental, social, and community planning effects of the proposed route have been considered at such hearing, an additional location hearing no longer is necessary. My reading of the decision does not lead me to that conclusion. Although the Fourth Circuit did find that a design hearing could cure a deficiency in a prior hearing, it applied this holding to a very narrow factual situation. The question in this aspect of the *Arlington Coalition* case was whether the subsequent design hearing could satisfy section 128(a) where the change in the economic effect of the highway from the time of the original hearing was caused by a change in design (i. e. the expansion of the highway from eight to fourteen lanes). *Ibid*, 458 F.2d at 1338. The court specifically limited its comments about the design hearing satisfying the revised requirements of § 128(a) by saying:

"Since the *economic effects* of the Lee Highway section of Arlington I–66 might be substantially different than expected in 1958 *because of the design* of this portion, a hearing on the design alone of this portion is sufficient." (Emphasis supplied). *Ibid* 458 F.2d at 1338.

There is little doubt in this court's mind that every conceivable problem advanced by the plaintiffs and arguably created by the proposed construction of Segment 9 of I–70N has been considered by the appropriate governmental officials over the years relating to the economic, social, environmental and other effects of the proposed road and alternative routes. There would seem to be some practical merit in the position of the defendants that the requirement of a new hearing at this stage of the game relative to Segment 9 of I–70N would exalt form over substance. Even so, as previously noted, the policy of the laws adopted by Congress, as interpreted by the Fourth Circuit in *Arlington Coalition*, is to assure that consideration be given not only to expert studies and conclusions but to expressions of fact and opinion by members of the public at a public hearing seeking information concerning the factors listed in revised 23 U.S.C. § 128(a). The former without the latter, according to the Fourth Circuit, is insufficient to allow the project to qualify for federal monetary assistance under the requirements laid down

I–70N. If, as the Fourth Circuit has held, NEPA requires application of revised § 128(a) to a project which has passed the point at which old § 128(a) used to apply but which has not yet reached the "critical stage of completion," this court believes that standards of the type set forth in Environmental Law Fund v. Volpe, 340 F.Supp. 1328 (N.D.Cal., 1972) are more appropriate for that determination.

by Congress which holds the purse strings.

## IX. *Relief*

A decree will be entered by this court, consistent with this opinion, ordering that before further steps may be taken toward the construction of I–70N, defendants, federal, city and state, must comply with the provisions of 23 U.S.C. § 128 as amended and PPM 20–8 (1969). "Compliance," paraphrasing the Fourth Circuit's statement in the *Arlington Coalition* case, "means not only reconsideration of the proposed location of [Segment 9 of I–70N] in the light of environmental, social, and economic policies set forth in the statutes; it means also suspension of work on [Segment 9 of I–70N] pending this reconsideration." 458 F.2d p. 1327.

Therefore, the order will restrain and enjoin defendants from the following general activities pending compliance with the statutory requirements and regulations:

1. The solicitation of or advertising for bids for the construction of Segment 9 of I–70N.

2. The awarding or execution of any contract for construction of Segment 9 of I–70N.

3. The actual construction of Segment 9 of I–70N.

4. The approval by federal defendants of either the location or design of Segment 9 of I–70N, except as otherwise provided for in the order.

5. The dispersal of federal funds which under federal law cannot be dispersed prior to the approval of the location of Segment 9 of I–70N.

6. The further acquisition of right of way necessary for the construction of Segment 9 of I–70N.

The order enjoining and restraining defendants from the above activities will remain in force and effect until the following procedures have been effected:

1. The state defendants have certified to the Secretary of Transportation, pursuant to 23 U.S.C. § 128(b) as amended, and PPM 20–8 (1969) that a new corridor public hearing has been held (or that opportunity for such hearing has been afforded) to obtain information concerning the economic and social effects of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community;

2. The federal defendants have approved a route location after complying with the above procedures;

3. The state defendants have certified to the Secretary of Transportation, pursuant to section 128(b) as amended and PPM 20–8 (1969), that a highway design public hearing has been held (or that opportunity for such hearing has been afforded) on the route location selected to obtain information concerning the economic and social effects with regard to the design of the proposed location of I–70N, its impact on the environment and its consistency with the goals and objectives of such urban planning as has been promulgated; and

4. All defendants have considered in accordance with 23 U.S.C. § 128 as amended and PPM 20–8 (1969) the information obtained from both the design public hearing and the corridor public hearing and, further, all defendants have reconsidered the location and design of the expressway designated as Segment 9 of I–70N in light of the environmental, social and economic policies set forth in 23 U.S.C. § 128, 42 U.S.C. § 4331 *et seq.* and PPM 20–8 (1969) and the information obtained from such hearings as well as other pertinent information.

Plaintiffs shall draft an order embodying the relief set forth above, and within five (5) days after the date of this opinion, shall submit copies to the defendants for comment. Within ten (10) days after the date of this opinion,

**1228**

plaintiffs shall submit a copy of the proposed order together with any comments of the defendants for approval by this court.