**Ronald L. JOSEPH and Betty Joseph, Plaintiffs,**

v.

**Brock ADAMS, Secretary, U. S. Department of Transportation, David A. Merchant, Region V Division Administrator, U. S. Department of Transportation, and John P. Woodford, Michigan Director of State Highways and Transportation, Defendants.**

Civ. A. No. 76–40076.

United States District Court, E. D. Michigan, S. D.

April 27, 1978.

Patrick H. Hynes, Flint, Mich., Peter W. Steketee, Grand Rapids, Mich., Ronald L. Joseph, Flint, Mich., for plaintiffs.

Frank Kelley, Atty. Gen., Janis Meija, Francis J. Carrier, Asst. Attys. Gen., Lansing, Mich., Harold A. Johnson, Jr., Asst. U. S. Atty., Flint, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

JAMES HARVEY, District Judge.

On July 8, 1976, plaintiffs filed a complaint seeking a declaration of their rights with respect to, and to enjoin the construction of, the proposed extension of Dort Highway. Plaintiffs allege an environment impact statement (EIS), a document which considers in detail the environmental consequences of, and alternatives to, proposed major federal action which will significantly affect the environment, must be filed in compliance with Section 102(c)(2) of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq.,* and public hearings must be held in compliance with the Federal Aid Highway Act (FHWA), 23 U.S.C. § 101 *et seq.* Plaintiffs also allege violations of the Michigan Environmental Protection Act, M.C.L.A. § 691.1201 *et seq.* and Michigan Executive Order 1974–4 and guidelines issued thereunder. Defendants moved to dismiss or, in the alternative, for summary judgment, for failure to state a claim on which relief can be granted and laches. In addition, the state defendants allege they are immune from suit under the Eleventh Amendment to the U. S. Constitution, lack of subject matter jurisdiction, and lack of standing of the plaintiffs to bring this action. Plaintiffs have cross-moved for summary judgment on the federal claims.

## FACTUAL BACKGROUND

Dort Highway, a free access highway built in the 1940's and originally intended as an eastern bypass around Flint, Michigan, presently runs north into Flint from a point about one mile south of Saginaw Street and two miles east of I–475. Saginaw Street is a free access highway which runs northwest from I–75 through the City of Grand Blanc, a small community approximately three miles southeast of Flint, and into Flint. Dort Highway intersects Saginaw Street about 2.5 miles south of Flint. The southern terminus of I–475 is at I–75, about four miles south of Flint; I–475 does not provide access to the region south of I–75. I–75 runs northwest from Detroit and bypasses south and west around Flint.

At issue in this case is the proposed extension of Dort Highway south to I–75. The extension would be about 2.5 miles in length and consist of five contiguous lanes. The northern two-thirds of the extension would be free access, the southern third being limited access. The extension, consisting of all five lanes, would by contrast to I–475, run south from I–75 for about one-half mile and connect with McWain Road, a north-south, two-lane gravel road with its northern terminus near the point of the proposed connection.

The plaintiffs reside on McWain Road, approximately one-half mile south of the proposed connection. Although it appears that McWain Road would be paved if the extension is completed, the parties dispute whether the road would be widened to four lanes. About fifty vehicles per day presently use McWain Road.

The region south of I–75 is basically rural, consisting of primarily uncultivated farmland and several scattered wood lots. South of the proposed interchange, there are seven lakes over 100 acres in size. The trend in the land use in this area, however, is toward residential development.

This region is not directly connected to the region north of I–75. I–75 presently acts as a barrier and restricts the flow of traffic between the two regions. Traffic leaving the vicinity of existing Dort Highway and travelling south must "zig-zag" back and forth over several roads to reach the area south of I–75. Further, traffic south of I–75 cannot enter I–75 or proceed northerly conveniently.

This pattern of uncultivated farm land and single-family dwellings also characterizes the region surrounding the southern two-thirds of the proposed extension. The Oakhill subdivision lies to the immediate northwest of the proposed interchange; two other subdivisions lie on either side of the proposed extension and north of Oakhill. There are several wetlands and wood lots in the area.

The vicinity surrounding the northern third of the proposed extension consists of commercial and industrial development; a General Motors factory lies at the northern terminus of the proposed extension. Several residences line existing Dort Highway immediately north of the proposed extension.

A hearing was held on the proposed extension on November 21, 1966 by the Michigan Department of State Highways (MDSH) for the purpose of seeking federal funding of the project. On December 12, 1966, the U.S. Bureau of Public Roads approved the project for "further development of design"; on May 26, 1967 acknowledged to the MDSH that the public hearing was held in compliance with federal funding requirements; and on January 15, 1970 approved the acquisition of right of ways for the project.

Except for the acquisition of the necessary right of ways, the project was dormant until the fall of 1975. At that time, defendants issued a draft Negative Declaration (ND), a mini-EIS which concludes, after a limited study of the environmental consequences, that proposed federal action will not significantly affect the environment and, therefore, no EIS is required. On October 15, 1975, and April 20, 1976, the MDSH conducted public hearings for the purpose of discussing the contents of the draft ND. Further, on December 2, 1975, the MSHD held a meeting with residents of Oakhill subdivision and the plaintiff, at which the need, environmental impact, and safety of the project were discussed. The general public was not notified of this meeting. On July 26, 1976, a final ND was issued. Final approval of federal funding for the interchange was granted on September 30, 1976 and, for the remainder of the project, on March 14, 1978.

On its face, the ND indicates the project will affect the environment in several respects:

1) Noise: The ND states the extension will inject traffic into an area not currently subject to traffic noise and that homes along existing Dort Highway will have their noise levels increased;

2) Aesthetics: A wood lot in the area of the proposed interchange would be lost, "the open grassy land" will be converted to a five-lane roadway, vegetation in a wetland south of the General Motors plant would be removed, and existing topography features will unavoidably be altered by grading and cut and fill activities;

3) Farmland: Uncultivated farmland within the purchased right of way would be lost;

4) Drainage: Due to the sealing of previously unsealed areas, the rate of runoff will be significantly increased, necessitating significant compensatory measures, including the use of existing wetlands, installation of flat equalizer culverts, and the creation of retention ponds. Further, ground water levels and flows may be disturbed or reduced due to decreased infiltration of water into the ground;

5) Soil Erosion: The removal of natural ground cover increases the potential for erosion rapidly;

6) Wildlife: The project will remove eight acres of mature hardwoods, four acres of shrubby cut-over woodlot, and thirty-one acres of wetland. Although no rare or endangered species will be affected, these ar-

eas do include a noticeable population of cottontail rabbits and muskrats, as well as fox, squirrel, racoon, ringnecked pheasant, woodchuck, mallard, black ducks, blue-winged teal, hawks, owls, songbirds and small mammals;

7) Recreational Areas: Better access to the lakes south of I–75 may induce an increase in recreational usage of that area;

8) Traffic: New traffic, a significant portion of which will consist of trucks, will be introduced into a virgin area south of existing Dort Highway, and the ND concedes this to be an "adverse impact." The ND also indicates that traffic will increase in the area south of the proposed interchange because of traffic exiting off I–75, as well as local traffic using direct access between the regions north and south of I–75;

9) Secondary Effects: New development may occur along the extension, as well as in the area south of I–75, because of improved access to the Flint metropolitan area. The ND states that developers may already own land because the proposal has been known for some time. The ND, however, as plaintiffs point out, does not describe what impact this development may have on wildlife, wetlands, and land use in the area affected;

10) Safety: Residents along Dort Highway will have difficulty exiting and entering the road due to increased traffic volume, especially during shift changes at the General Motors plant.

In addition to the environmental impacts described above, the ND also considers several alternatives to the project. Two alternatives were rejected in part for their failure to provide access to the area south of I–75. In addition to the foregoing reason, the "do-nothing" alternative was rejected because the project was needed to provide a bypass around Grand Blanc for traffic entering and exiting Flint via Dort Highway. The selected alternative was chosen not only because it was least costly of the full interchanges and minimized displacement of families, but because "it helps promote growth of the area south of I–75 by providing local access".

## JURISDICTION

The court clearly has subject matter jurisdiction in this case under 28 U.S.C. § 1331(a) (federal question). This action, based on NEPA and FHWA, arises under the laws of the United States, and plaintiffs have alleged there is excess of $10,000 in controversy. Defendants' assertion that the requisite $10,000 in controversy is not present is erroneous. It is beyond question that $10,000 may be in controversy notwithstanding the suit is for equitable relief. See *Illinois v. City of Milwaukee,* 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972); *Commonwealth of Pennsylvania v. Morton,* 381 F.Supp. 293 (D.D.C., 1974). Indeed, in environmental litigation, the courts have been reluctant to find the requisite amount is not in controversy. See *Nolop v. Volpe,* 333 F.Supp. 1364 (D.S.D., 1971); *Citizens for Clean Air, Inc. v. Corps of Engineers,* 349 F.Supp. 696 (S.D.N.Y., 1972).

To successfully challenge the jurisdictional amount, the court must find that the plaintiffs have alleged the amount in controversy in bad faith or that it appears to a legal certainty that the amount in controversy does not satisfy jurisdictional requirements. See *St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed.2d 845 (1938); *Citizens for Clean Air Inc. v. Corp. of Engineers, supra.* In this case, plaintiffs have alleged the proposed extension would introduce air and noise pollution to, and increased traffic by, their residence, as well as change the area from a rural to an urban community. Under these circumstances, the Court is unable to say that plaintiffs have alleged the amount in controversy in bad faith or that it appears to a legal certainty that the jurisdictional amount is not present.

In addition to federal question jurisdiction, this Court also finds it has jurisdiction under 28 U.S.C. § 1361 (mandamus). The courts have consistently held that where the plaintiff establishes that a federal agency had a duty to file an environmental impact statement, that duty can be en-

forced by way of mandamus. See *Harlem Valley Transportation Association v. Stafford,* 500 F.2d 328 (CA 2, 1974); *McDowell v. Schlesinger,* 404 F.Supp. 221 (W.D.Mo., 1975); *Concerned Residents of Buck Hill Falls v. Grant,* 388 F.Supp. 394 (M.D.Pa., 1975), *modified on other grounds* 537 F.2d 29 (CA 3, 1976); *Ward v. Ackroyd,* 344 F.Supp. 1202 (D.Md., 1972).

## ELEVENTH AMENDMENT

■ The State's position with respect to the Eleventh Amendment issue is also without merit. The Eleventh Amendment provides:

"The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

In this connection, it is well-settled that this provision also bars suits against a state by a citizen of that state. See *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

Notwithstanding its broad language, certain suits against state officials, in their official capacity, do not trigger the Eleventh Amendment. In *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Court held the Eleventh Amendment did not bar a suit to enjoin the Attorney General of Minnesota from enforcing a statute claimed to violate the Fourteenth Amendment to the U.S. Constitution. In *Edelman v. Jordan,* the Court, refining the holding in *Ex parte Young,* held the nature of the relief requested was critical in determining the applicability of the Eleventh Amendment. Only where the relief requested was "prospective" in nature, as opposed to one for the recovery of money from the State, would the suit escape the clutches of the Eleventh Amendment. Conceding this issue is not always easily resolved, as suits for equitable relief often do have an impact on state treasuries, the Court indicated that one must distinguish between cases in which the impact is the necessary result of compliance with decrees which are by their terms prospective in nature and those where the relief requested is a form of compensation for violation of the plaintiffs' rights.

Applying *Edelman,* the lower courts have barred suits against state officials on Eleventh Amendment grounds only where the relief would require the direct payment of money from the state treasury to the plaintiffs. See *Jagnandan v. Giles,* 538 F.2d 1166 (CA 5, 1976); *Long v. Richardson,* 525 F.2d 74 (CA 6, 1975); *Soni v. Board of Trustees,* 513 F.2d 347 (CA 6, 1975). The Supreme Court emphasized this in *Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977), where, in upholding court ordered state funding one one-half the cost of certain desegregation remedial measures, it stated:

"In contrast to *Edelman,* there was no money award here in favor of respondent Bradley or any members of his class. This case simply does not involve individual citizens' conducting a raid on the state treasury for an accrued monetary liability. The order here is wholly prospective in the same manner that the decree mandates vocational schools and assignments, for example."

See also *Huecker v. Milburn,* 538 F.2d 1241 (CA 6, 1976); *Byram River v. Village of Port Chester,* 394 F.Supp. 618 (S.D.N.Y., 1975); *Stebbins v. Weaver,* 396 F.Supp. 104 (W.D.Wis., 1975), *affirmed,* 537 F.2d 939 (CA 7, 1976), *cert. denied* 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977).

■ In this case, it seems clear that the Eleventh Amendment defense does not apply. Plaintiffs are not requesting monetary relief. On the contrary, plaintiffs are seeking to enjoin state officials from continuing with the Dort Highway project until an EIS has been filed and the required hearings have been held. This prospective equitable relief does not trigger the Eleventh Amendment.

The Court notes this analysis differs from that of other courts in similar situations. The courts in *Ward v. Ackroyd,* 344 F.Supp. 1202 (D.Md., 1972), and *Elliot v. Volpe,* 328

F.Supp. 831 (D.Mass., 1971) considered the Eleventh Amendment applicable and then considered whether the state defendants had waived its protection by voluntarily participating in the federal highway program. By finding, contrary to those decisions, that the Eleventh Amendment is not applicable in the first instance, it is unnecessary to resolve the secondary issue of whether there was a waiver of that immunity by the state. In this connection, however, the finding of a waiver in *Ward* is questionable in light of the clarification of the waiver requirements by the Court in *Edelman* and *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976).

### STANDING

■ Defendants also assert plaintiffs do not have standing to bring this action. Under well-settled rules, in order to establish standing, plaintiffs must allege the requisite injury in fact and be within the zone of interests to be protected by the statute. *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). Further, under the injury-in-fact test, plaintiffs must allege injury to more than a cognizable interest; the plaintiffs themselves must be among the parties who are injured. *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Plaintiffs in this case are clearly within the zone of interests to be protected by NEPA. *Davis v. Coleman,* 521 F.2d 661 (CA 9, 1975); *McDowell v. Schlesinger,* 404 F.Supp. 221 (W.D.Mo., 1975); *Environmental Defense Fund v. Tennessee Valley Authority,* 468 F.2d 1164 (CA 6, 1972). In addition, plaintiffs, claiming the project will introduce air and noise pollution to, and increased traffic by, their residence, as well as affect the land use of the surrounding community in which they live, have alleged the requisite injury-in-fact. See *Davis v. Coleman, supra* ; *Scherr v. Volpe,* 336 F.Supp. 882 (W.D.Wis., 1971), *affirmed,* 466 F.2d 1027 (CA 7, 1972).

### SECTION 102(c) of NEPA

Section 102(c) of NEPA, 42 U.S.C. § 4332(c), requires all agencies of the Federal Government to include an EIS "in every recommendation or request on . . . major Federal actions significantly affecting the quality of the human environment." Defendants, conceding the proposed extension of Dort Highway is a "major federal action", have determined nevertheless that the project will not significantly affect the quality of the human environment. The decision, in conformance with 23 CFR § 771.11 of the Federal Highway Administration (FHA) regulations, was recorded in an ND. Plaintiffs assert the decision was erroneous and that an EIS is required.

### RETROACTIVITY

Initially, inconsistent with their preparation of the ND, the MDSH has alleged that NEPA does not apply retroactively to administrative action taken prior to the effective date of NEPA, January 1, 1970. This argument cannot be sustained. In this connection, in the context of highway litigation, the courts are divided, perhaps not irreconcilably, on the proper test for determining whether NEPA is applicable to a project initiated before the effective date of NEPA. The Fourth and Seventh Circuits have adopted a balancing approach, holding NEPA applicable to a project until it has reached the stage of completion at which the costs of abandoning the proposed route would clearly outweigh the benefits therefrom. See *Arlington Coalition on Transportation v. Volpe,* 458 F.2d 1323 (CA 4), *cert. denied* 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972); *Scherr v. Volpe,* 466 F.2d 1027 (CA 7, 1972). See also *Keith v. Volpe,* 352 F.Supp. 1324 (1972), *affirmed on other grounds,* 506 F.2d 696 (CA 9, 1974). Refining this test, district courts in the Ninth and First Circuits have adopted a two-tier approach: 1) where "design approval is given by the federal government after January 1, 1970, NEPA must be complied with in full, but 2) where "design approval" is given prior to that date, NEPA must be complied with only where it is

"practicable", taking into account various factors. See *Conservation Society of Southern Vermont v. Volpe,* 343 F.Supp. 761 (D.Vt., 1972); *Environmental Law Fund v. Volpe,* 340 F.Supp. 1328 (N.D.Cal., 1972).

■ The Second Circuit, on the other hand, has focused on whether there are major federal decisions to be made concerning the project after the effective date of NEPA, since NEPA mandates that federal decision-making after that date take into account the environmental impact of the project. Since the federal government is not contractually obligated to fund the project until after it has given "PS & E" approval (to be discussed below), NEPA was applicable to projects which had not yet received such approval as of January 1, 1970. *Monroe County Conservation Council, Inc. v. Volpe,* 472 F.2d 693 (CA 2, 1972).

This court adopts the view of the Second Circuit. The Sixth Circuit, in *Environmental Defense Fund v. Tennessee Valley Authority,* 468 F.2d 1164 (CA 6, 1972), a case involving a purely federal non-highway project, has stated with respect to the retroactivity of NEPA:

"We believe it more consonant with congressional intent to hold that an agency must file an impact statement whenever the agency intends to take steps that will result in a significant environmental impact, whether or not those steps were planned before 1–1–1970, and whether or not the proposed steps represent simply the last phase of an integrated operation most of which was completed before that date. . . .

"Although this formulation might compel the preparation of impact statements for projects that are so nearly complete that there is no reasonable prospect that the decision to proceed as planned would be reversed, that is no reason to adopt a lesser standard and thereby encourage bureaucratic evasion of responsibility." 468 F.2d at 1177 and n. 9.

In this connection, where a project, in contrast to that in *Environmental Defense Fund,* involves the federal funding of state construction, the analysis properly centers on the funding decisions to be taken by the agency after January 1, 1970. See *Jones v. Lynn,* 477 F.2d 885 (CA 1, 1973). In light of the approach of the Sixth Circuit, this court concludes, therefore, consistent with the view of the Second Circuit, that the cost of abandoning the particular project is irrelevant in determining whether compliance with NEPA is required, and that the proper inquiry is whether final approval of federal funding (PS & E approval) was given before January 1, 1970. Compare *Pennsylvania Environmental Council, Inc. v. Bartlett,* 454 F.2d 613 (CA 3, 1971).

■ Applying this test, it is clear that NEPA applies to the Dort Highway project. PS & E approval of the proposed interchange was not given until September 30, 1976, and the remainder of the extension was not finally approved until March 14, 1978. The Court notes, however, that the result would not be different had it applied the balancing approach used by other courts. Indeed, the situation in this case is strikingly similar to that in *Arlington Coalition on Transportation v. Volpe,* 458 F.2d 1323 (CA 4), *cert denied* 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972).

## STANDARD OF REVIEW

■ The decision that proposed federal action does not significantly affect the quality of the human environment involves a mixed question of law and fact. See *Hanly v. Kleindienst,* 471 F.2d 823 (CA 2, 1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973) (*Hanly II*). The courts uniformly hold that the meaning of the word "significantly" for purposes of the above-quoted phrase is a question of law for the courts. See, e. g., *Hanly II, supra ; Mid-Shiawassee County Concerned Citizens v. Train,* 408 F.Supp. 650 (E.D. Mich., 1976), *affirmed without opinion* 559 F.2d 1220 (CA 6, 1977); *Simmans v. Grant,* 370 F.Supp. 5 (S.D.Tex., 1974); *Natural Resources Defense Council, Inc. v. Grant,* 341 F.Supp. 356 (E.D.N.C., 1972). Similarly, most courts agree that the threshold appli-

cation of that standard to the facts in the particular case is for the agency. See, e. g., *First National Bank of Chicago v. Richardson,* 484 F.2d 1369 (CA 7, 1973); *Hanly II, supra.* In like fashion, most courts will review the agency's threshold decision only where the plaintiff raises "substantial environmental issues," that is, alleges facts, which if true, demonstrate the project could significantly affect the quality of the human environment. *Maryland-National Capital Park and Planning Commission v. U.S. Postal Service,* 159 U.S.App.D.C. 158, 487 F.2d 1029 (1973); *Hiram Clarke Civic Club, Inc. v. Lynn,* 476 F.2d 421 (CA 5, 1973); *Save Our Ten Acres v. Kreger,* 472 F.2d 463 (CA 5, 1973); *Mid-Shiawassee County Concerned Citizens v. Train, supra.*

The courts, however, are divided on the amount of deference to be given to the agency's threshold decision. Some courts will overturn the agency's decision only where it is shown the decision was arbitrary or capricious. *Nucleus of Chicago Homeowners Ass'n v. Lynn,* 524 F.2d 225 (CA 7, 1975), *cert. denied* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976); *Harlem Valley Transportation Ass'n v. Stafford,* 500 F.2d 328 (CA 2, 1974); *Hanly II, supra; Mid-Shiawassee County Concerned Citizens, supra; Smith v. City of Cookeville,* 381 F.Supp. 100 (M.D.Tenn., 1974). Under this standard, the agency's decision will be upheld if the agency has considered the environmental issues raised by the plaintiff and its conclusions are based on a reasoned decision. *Hanly II, supra.*

Other courts have adopted a more exacting standard and have upheld the agency's decision only where it is "reasonable." *Davis v. Coleman,* 521 F.2d 661 (CA 9, 1975); *Wyoming Outdoor Coordinating Council v. Butz,* 484 F.2d 1244 (CA 10, 1973); *Minnesota Public Interest Research Group v. Butz,* 498 F.2d 1314 (CA 8, 1974); *Ridley Township v. Blanchette,* 421 F.Supp. 435 (E.D. Pa., 1976). Exactly what is meant by the term "reasonable", however, is not clear. For some courts, it has apparently meant *de novo* review. See *Natural Resources Defense Council v. Grant, supra.* For other courts, it apparently means an agency deci-

sion which has demonstrated a "compelling case" of nonsignificance. See *Wyoming Outdoor Coordinating Council, supra; McDowell v. Schlesinger, supra; Maryland-National, etc., Park and Planning Commission, supra.* At least one other court has indicated that an agency's decision is reasonable where it demonstrates by a "preponderance of the evidence" that the project will not have a significant impact on the environment. See *Simmans v. Grant, supra.*

The Sixth Circuit, although affirming without opinion the decision in *Mid-Shiawassee,* has not expressly considered the proper standard to be used. Further, notwithstanding the *Mid-Shiawassee* court stated it was adopting the arbitrary and capricious standard, a careful reading of that case reveals that the court did not review the agency decision of nonsignificance. As the court found, the plaintiffs in that case had not raised substantial environmental issues triggering the need for review of that agency decision. Plaintiffs in that case, rather, were attacking the choice of a particular alternative because of bias of the agency decisionmaker. Further, as quoted above, the Sixth Circuit has indicated in *Environmental Defense Fund v. Tennessee Valley Authority,* 468 F.2d 1164 (CA 6, 1972), that the standards to be adopted in connection with NEPA should not encourage bureaucratic evasion of responsibility. The arbitrary and capricious standard would do just this. This is precisely the rationale for the rejection of the arbitrary and capricious standard in favor of the reasonableness standard:

"NEPA was intended not only to insure that the appropriate responsible official considered the environmental effects of the project, but also to provide Congress (and others receiving such recommendation or proposal) with a sound basis for evaluating the environmental aspects of the particular project or program. The spirit of the Act would die aborning if a facile, ex parte decision that the project was minor or did not significantly affect the environment were too well shielded from impartial review."

*Save Our Ten Acres v. Kreger, supra,* 472 F.2d at 466.

 Because the "reasonableness" standard is better suited to effect environmental policies in a manner consistent with the Sixth Circuit decision in *Environmental Defense Fund, supra,* and the precedential value of *Mid-Shiawassee* is questionable, this court declines to review the agency decision of nonsignificance in this case under the arbitrary and capricious standard.

Specifically, the Court will review the agency decision in this case according to the criteria of the District of Columbia Circuit decision in *Maryland-National, etc., Park and Planning Commission v. U.S. Postal Service, supra,* 159 U.S.App.D.C. at 169, 487 F.2d at 1040. These are:

1) Did the agency take a "hard look" at the problem, as opposed to bald conclusions, unaided by preliminary investigation;

2) Did the agency identify and adequately investigate the relevant areas of environmental concern;

3) As to the problems studied and identified, does the agency make a convincing case that the impact is insignificant;

4) If an impact is of true significance has the agency convincingly established that changes in the project have sufficiently minimized it.

 Further, where the agency has failed to identify and to investigate adequately the relevant areas of environmental concern or to state its reasons why an area of concern, once identified and adequately considered, does not significantly affect the environment, the proper procedure is to remand the decision to the agency for further development of the record. See *Hanly v. Mitchell,* 460 F.2d 640 (CA 2, 1972); *Hanly II, supra; Simmans v. Grant, supra.* But see *Hiram Clarke Civic Club v. Lynn, supra; Save Our Ten Acres v. Kreger, supra; Mid-Shiawassee County Concerned Citizens v. Train, supra.*

This approach strikes the appropriate balance between the need to discourage bureaucratic evasion of responsibility to inform themselves, Congress, and the public of the environmental consequences fully of their proposed actions and to consider those consequences in determining the need, location, and design of the project and the need to confine the court to purely a reviewing function of a decision which should properly be made by the agency.

 In this connection, it is important to distinguish the standard for review of the decision not to file an EIS from review of the substantive decision of the agency to proceed with the project after it has considered the EIS. Although the later decision is reviewable, *Environmental Defense Fund v. Corps of Engineers,* 470 F.2d 289 (CA 8, 1972), *cert. denied,* 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973), the courts uniformly hold it will not be overturned unless it is arbitrary or capricious. See *Environmental Defense Fund v. Corps of Engineers, supra; Wyoming, etc., Coordinating Council v. Butz, supra.*

## MEANING OF "SIGNIFICANTLY"

Exactly what is meant by actions which will significantly affect the environment has not been adequately clarified. The Second Circuit has stated the determination requires consideration of at least two factors:

"1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area affected by it, and 2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area. Where conduct conforms to existing uses, its adverse consequences will usually be less significant than when it represents a radical change."

*Hanly v. Kleindienst, supra,* 471 F.2d at 830–31.

The Fifth Circuit has focused on the possibility of some "significant degradation of some human environmental factor (even though other environmental factors are affected beneficially or not at all)." *Save*

*Our Ten Acres v. Kreger, supra,* 472 F.2d at 467. The standard has also been construed:

"as having an important or meaningful effect, direct or indirect, upon a broad range of aspects of the human environment. The cumulative impact with other projects must be considered. Any action that substantially affects, beneficially or detrimentally, the depth or course of streams, plant life, wild life habitats, fish and wildlife, and the soil and air 'significantly affects the quality of the human environment.' "

*Natural Resources Defense Council v. Grant, supra,* 341 F.Supp. at 367.

Council on Environmental Quality regulations point out that additional factors to be considered are the degree of controversy generated by the project, the degree to which long-term environmental goals are foreclosed, and the secondary impacts of the project on the environment. 40 CFR § 1500.6 (1977). With respect to highway proposals, FAA regulations state the following actions ordinarily have an adverse impact:

1) An action that has more than minimal effect on properties protected under Section 4(f) of the DOT Act or Section 106 of the Historic Preservation Act.

2) An action that is likely to be highly controversial on environmental grounds or with respect to the availability of adequate relocation housing.

3) An action that is likely to have a significantly adverse impact on natural, ecological, cultural or scenic resources of national, State, or local significance.

4) An action that (i) causes significant division or disruption of an established community or disrupts orderly, planned development, or is determined to be significantly inconsistent with plans or goals that have been adopted by the community in which the project is located, as determined by a responsible official(s); or (ii) causes a significant increase in traffic congestion.

5) An action which (i) is determined to be inconsistent with any Federal, State, or local law or regulation relating to the environment; or (ii) has a significant detrimental impact on air or water quality or on ambient noise levels for adjoining areas; or (iii) may contaminate a public water supply system."

23 CFR § 771.10 (1977).

A more appropriate approach to clarifying the term "significantly" is to define that term by reference to the function of filing an EIS. In broad terms, the EIS is but one of several procedural methods listed in § 102 of NEPA designed by Congress to implement the broad environmental policies embodied in § 101 of NEPA. *Environmental Defense Fund v. Tennessee Valley Authority, supra,* 468 F.2d at 1175. In § 101(a) of NEPA, Congress has declared:

"that it is the continuing policy of the Federal Government . . . to use all practical means and measures . . . in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans."

To implement that policy, Congress, in § 101(b) of NEPA, has made it the continuing responsibility of federal agencies to use all practical means to improve and coordinate federal plans, functioning programs, and resources to accomplish, among other goals, the preservation of important historic, cultural, and natural aspects of our national heritage:

"The congressional mandate is clear. Federal officials are to appraise continuously all of their activities not only in terms of strict economic or technological considerations but also with reference to broad environmental concerns. They are to coordinate hitherto separate operations so that undesirable environmental effects may be perceived and minimized. Subject only to the limitation of practicability, they are to strive constantly to improve federal programs to preserve and enhance the environment. In other words, federal officials are required to assume the responsibility that the Con-

gress recognized, in section 101(c) of the NEPA, as the obligation of all citizens: to incorporate the consideration of environmental factors into the decision-making process."

*Environmental Defense Fund, supra,* 468 F.2d at 1174.

The EIS helps to assure the implementation of these policies by providing the information necessary to make the most intelligent, optimally beneficial decision. See *Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission,* 146 U.S.App. D.C. 33, 38, 449 F.2d 1109, 1114 (1971). As the Ninth Circuit has stated:

"While the narrow purposes of the EIS requirement are to inform the public and agency decisionmakers of the environmental consequences of federal action, see *Trout Unlimited v. Morton,* 9 Cir., 1974, 509 F.2d 1276, 1282, the broader objectives of NEPA clearly encompass agency use of the environmental information developed in an EIS to minimize environmental damage to the greatest extent possible consistent with other important objectives. This is what NEPA is all about. See 42 U.S.C. § 4331(a): '[I]t is the continuing policy of the Federal Government . . . to use all practicable means and measures . . . to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.' "

*Davis v. Coleman, supra,* 521 F.2d at 670.

In light of these purposes, an EIS is functional, therefore, only where the environmental consequences of the proposed federal action would, in order to effect the substantive policies of NEPA, factor in making the most intelligent and beneficial decision.

█ This court, therefore, holds that proposed federal action which will significantly affect the quality of the human environment is that whose reasonably expected environmental consequences would, in order to comply with the substantive policies of NEPA, affect a decision concerning the need for, or the proposed location or design of, the federal proposal. The application of this test will require an analysis of the need for the project, the environmental consequences which it can reasonably be expected to generate, and the availability of location and design alternatives which will achieve the objectives of the proposed project.

This test is supported by the analysis of the Ninth Circuit in the analogous situation in *Davis v. Coleman,* 521 F.2d 661 (CA 9, 1975).

In *Davis,* the Court determined that a proposed interchange in a rural area designed to provide convenient access to that area from the research community surrounding Davis, California would significantly affect the environment. In so holding the Ninth Circuit considered both the need for the project and the environmental consequences which it would generate:

". . . it is obvious that constructing a large interchange on a major interstate highway in an agricultural area where no connecting road currently exists will have a substantial impact on a number of environmental factors . . .

"The growth-inducing effects of the project are its raison d'etre, and with growth will come growth's problems: increased population, increased traffic, increased pollution, and increased demand for services . . .

"We think that this is precisely the kind of situation Congress had in mind when it enacted NEPA: substantial questions have been raised about the environmental consequences of federal action, and the responsible agencies should not be allowed to proceed with the proposed action in ignorance of what those consequences will be. NEPA . . . require[s] that the interchange's environmental impact be studied and analyzed in good faith before . . . decid[ing] whether the project is to be completed as planned, or to be modified or abandoned. Davis has raised disturbing questions. It is now up to the defendants to answer those questions."

*Davis v. Coleman, supra,* 521 F.2d at 674–76.

See also *Minnesota Public Interest Research Group v. Butz,* 498 F.2d 1314 (CA 8, 1974); *Save Our Ten Acres v. Kreger,* 472 F.2d 463 (CA 5, 1973); *Wyoming Outdoor Coordinating Council v. Butz,* 484 F.2d 1244 (CA 10, 1973).

## REVIEW OF THE DORT HIGHWAY DECISION

A review of the ND reveals that the FHA decision that the Dort Highway project will not significantly affect the environment is deficient in two respects: 1) it does not adequately investigate all the environmental issues raised by the plaintiffs, and 2) with respect to a number of environmental issues considered, it does not include a statement of reasons why those effects are not significant.

Not adequately investigated are the secondary impacts the project will have on wetlands, wildlife, recreational areas, and land use in the rural area south of I–75. As in *Davis,* and as the ND frankly concedes, the encouragement of growth in that area is a primary purpose of the project. Indeed, the ND concedes that developers may already own land in that area in anticipation of that growth.

Defendants were well aware of those potential adverse impacts. The Michigan Department of Commerce made the following comment concerning the project:

"Will not construction of this highway encourage further development which will have significant secondary impacts on wildlife, wetlands and land use in the area?"

The defendants acknowledged that "the construction of the proposed project will most likely encourage further development of the area, especially south of I–75."

The ND has not adequately investigated the impact of these secondary effects on the environment. It merely states that the area will experience land development pressure because of improved transportation access and that there may be increased recreational usage of the land south of I–75.

Significantly, the ND is devoid of any discussion of what impact this "land development pressure" will have on wetlands, wildlife, and land use in this area.

Further, with regard to the environmental impacts which have been considered in the ND, no reasons are given as to why certain of these impacts will not have a significant affect on the environment. As to two areas of impact—noise and loss of farmland—the ND does attempt to minimize the significance of the impact.

The ND concedes that the project will introduce traffic to new areas which presently are not directly subjected to this form of noise generation, and that noise levels will be increased beyond the maximum federal design level of 70 DBA. It concludes, nevertheless, that a "noise exception" should be requested because the residents of the Oakhill subdivision are already subject to traffic noise from I–75 and the residences of the two subdivisions north of the Oakhill subdivision, though they did not previously experience traffic noise, will not have their noise levels perceptively increased beyond 70 DBA. In this connection, the ND states that the projected noise levels for residences along existing Dort Highway are a "secondary effect" and that there is nothing which can be done to protect three other residences which will have their noise levels increased from apparently 0 to 76 DBA.

Although this analysis may support a decision to seek a "noise exception", it does not indicate why the increase in traffic noise does not significantly affect the environment. Even though the noise levels may meet federal highway design standards, the injection of 70 DBA of traffic noise into a previously peaceful, rural area could be a significant environmental impact.

The defendants' conclusions as to the loss of farmland are adequately supported. The ND indicates that the land is currently uncultivated and would probably be used for residential development in the future. Because there is little potential for the loss of

productive farmland, this would not factor in a decision as to the need for, or the location or design of, the project. As to this issue, therefore, defendants have presented a convincing case that the loss of potential productive farmland will not significantly affect the environment.

With respect to the remainder of the environmental issues presented—aesthetics, drainage, soil erosion, wildlife, traffic, and safety—the ND does not state why these impacts are not significant. Indeed, the injection of traffic into the area south of existing Dort Highway is conceded to be an "adverse impact". In this connection, the description in the ND of the impact of the proposal on wildlife and wetlands is especially disturbing, and the court doubts whether a convincing case could be made that this will not have a significant environmental impact.

Turning to the fourth criteria, the defendants have taken steps to minimize the impact of the drainage problem. The ND states the additional drainage will be compensated for by the use of "flat equalizer culverts", existing wetlands, installation of retention ponds, and by cleaning out one of the drains which will catch the runoff.

These measures were the result of the recommendations from the Genesee County Drain Commission, which has reviewed and approved the final drainage plan. At the April 20, 1976 hearing, however, a primary concern of those in attendance was the impact this project will have on drainage in the area. The citizens pointed out that the area already has a drainage problem which would be aggravated by the sealing of additional grounds surfaces. In response to these concerns, the MDSH stated only that the compensatory measures adopted "should", in their opinion, mitigate the drainage consequences. In light of the skepticism at the meeting over the effectiveness of these measures, the importance to the citizens living in the area of the drainage consequences, and of the fact that the MDSH could not definitely state that the drainage consequences would be insignificant, the defendants have not convincingly minimized the significance of the drainage impact.

Defendants have also taken steps to improve the aesthetics of the project. The project has been redesigned to enlarge the wood lot on the northwest quadrant of the interchange to provide a greater buffer between the Oakhill subdivision. In addition, defendants plan to landscape the project when it is completed. These measures, however, do not convincingly establish the aesthetics problem is without significance. An open, grassy, area will not be traversed by a major five-lane highway. The project will eliminate significant hardwood, shrubby cut-over woodlot, and wetland areas. Further, the existing topography of the area will be permanently altered by cut and fill operations. As the ND concedes, no amount of landscaping could minimize the impact of this project on the aesthetic character of the area.

The department also plans to minimize the soil erosion impact of the project by providing "soil erosion treatment" to all areas of exposed earth which may be subject to erosion. No indication is given on the effectiveness of this treatment, and the significance of this problem has also not been sufficiently minimized.

Because the defendants have not adequately investigated the secondary impacts of this project on the environment south of I–75 and have not stated their reasons why the various impacts identified and investigated in the ND do not have a significant impact, this Court is unable to exercise meaningful review of the defendants' decision. The record is, therefore, remanded to the agency for further development on these points.

## SCOPE OF EIS ON REMAND

If, on remand, defendants ultimately decide that an EIS is required, plaintiffs have asked this court to provide guidance as to the proper scope of the EIS. Plaintiffs assert the Dort Highway project is part of a larger plan for the development of a highway network between Detroit and Flint, and that a regional EIS is required. In this

connection, plaintiffs assert that the Telegraph Road reconstruction and the proposed extensions of Northwestern Highway and M–275 north toward Flint, together with the proposed extension of Dort Highway, constitute one federal proposal or a series of connected federal proposals. Plaintiffs concede further discovery is necessary to factually support this claim.

■ The Court rejects this claim. In reaching this conclusion, the Court takes judicial notice that the proposed extensions of M–275 and Northwestern Highway have been rejected by the State Highway Commission. The law, as it has recently developed, is clear that an EIS must be filed only when an agency makes a proposal for federal action. In *Conservation Society of Southern Vermont v. Secretary of Transportation*, 508 F.2d 927 (CA 2, 1974), the Court held that the EIS must cover a route through three states notwithstanding the only proposal for federal funding was a seven-mile segment in Vermont and no plans had as yet been developed for other portions of the proposed route. The Supreme Court vacated and remanded the case in light of its decision in *Aberdeen & Rockfish R. Co. v. S.C.R.A.P.*, 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975). In *Aberdeen* the Court held that the earliest time an EIS is required is the time an agency makes a recommendation or report on a proposal for federal action. On remand, the First Circuit reversed and held the EIS need only cover the seven-mile segment since this was the only proposal currently being made by the agency. *Conservation Society of Southern Vermont v. Secretary of Transportation*, 531 F.2d 637 (CA 2, 1976).

■ With this in mind, there are two conceivable theories in support of plaintiffs' claim: 1) there is a series of federal proposals for highway construction in the region between Flint and Detroit whose cumulative environmental impact should be evaluated, see *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), and 2) the federal proposal at issue here is not the Dort Highway extension, *per se*, but one for an integrated network of highways in the region between Flint and Detroit, of which the Dort Highway extension is only a part.

A claim based on the first theory would be erroneous because there is presently no proposal for federal action with respect to the Northwestern Highway or M–275 extensions.

To support a claim based on the second theory, plaintiffs would be required to show that the agency decision as to the scope of the proposal was arbitrary. See *Kleppe v. Sierra Club, supra; Swain v. Brinegar*, 542 F.2d 364 (CA 7, 1976). The plans for the extension of M–275 and Northwestern Highway having been discarded, an EIS limited only to the environmental impact of the Dort Highway extension would hardly be arbitrary.

■ Further, even if those plans had not been discarded, the EIS could properly be limited solely to the impact of the Dort Highway extension. The courts have looked to three factors in connection with highway projects in considering whether the scope of the EIS is impermissibly narrow: 1) whether the segment considered has independent utility, 2) whether the segment chosen forecloses other avenues of expansion, and 3) if the proposed segment is part of a larger plan, whether that plan becomes concrete enough to make it highly probable that the entire plan will be carried out in the near future. See *Swain v. Brinegar, supra; Indian Lookout Alliance v. Volpe*, 484 F.2d 11 (CA 8, 1973); *Daly v. Volpe*, 514 F.2d 1106 (CA 9, 1975); *Patterson v. Exon*, 415 F.Supp. 1276 (D.Neb., 1976).

In this case, it is clear the Dort Highway extension would have independent utility as a bypass around Grand Blanc and as a means of convenient access to the area south of I–75. Neither would the segment in this case foreclose other avenues of expansion as nearby I–75 could be extended south of I–75 to provide access to that area. Further, if the proposed segment is part of a larger plan, that plan is at this stage still

visionary. The Court concludes, therefore, that the scope of an EIS, if the defendants should decide one is needed, could properly be limited to solely the impact of the proposed Dort Highway extension.

### SECTION 102(E) OF NEPA

Section 102(E) of NEPA, 42 U.S.C. § 4332(E), provides that all agencies of the Federal Government shall:

> "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."

This requirement is independent of the requirement of an EIS under § 102(c) of NEPA. Plaintiffs assert that defendants have failed to develop and describe appropriate alternatives to the proposal.

Defendants have two distinct obligations in this regard: 1) to develop appropriate alternatives and 2) to adequately describe the alternatives developed. It is clear that defendants are subject only to a rule of "reasonableness" in developing alternatives and every conceivable alternative need not be considered. See *Environmental Defense Fund, Inc. v. Corps of Engineers*, 470 F.2d 289 (CA 8, 1972), *cert. denied*, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973); *Environmental Defense Fund v. Tennessee Valley Authority*, 492 F.2d 466 (CA 6, 1972). In considering the reasonableness of the alternatives, courts have considered whether they would implement the objectives of the proposal and whether the alternatives suggested by the plaintiffs were raised by other agencies commenting on the proposal. See *Natural Resources Defense Council v. Tennessee Valley Authority*, 367 F.Supp. 128 (E.D.Tenn., 1973); *Kelley v. Butz*, 404 F.Supp. 925 (W.D.Mich., 1975).

With respect to the description of the alternatives developed, the courts have required more than a general discussion. Rather, the description must relate to the unique environment in the particular case. See *Kelley v. Butz, supra*. Further, the consideration of the alternatives must be significantly detailed to afford a basis for comparison of the problems involved with the proposed project with those in connection with the alternatives. See *Monroe County Conservation Council v. Volpe*, 472 F.2d 693 (CA 2, 1972).

Plaintiffs argue the defendants should have considered alternatives related to nearby I–475, as well as that of extending Dort Highway only to Grand Blanc Road, about one-half mile north of I–75. Further, plaintiffs argue the alternative of "doing nothing" was not described in sufficient detail.

In considering the alternatives suggested by the plaintiffs, the Court deems it useful to distinguish two aspects of the proposed Dort Highway extension: 1) the connection of existing Dort Highway with I–75 to relieve congestion in Grand Blanc, and 2) the extension from the interchange to McWain Road to provide convenient access to the region south of I–75. With respect to the former aspect, the failure to consider alternatives related to the use of nearby I–475 was not erroneous. Routing alternatives related to I–475 would do little to relieve the congestion through Grand Blanc since this traffic, already having access to Flint via I–475, nevertheless prefers to enter and leave Flint via existing Dort Highway. For similar reasons, a routing alternative which extends only to Grand Blanc Road is not feasible.

A routing alternative related to nearby I–475 would, however, serve the purpose of providing convenient access to the region south of I–75. It would hardly be inconvenient for traffic on Dort Highway bound for the region south of I–75 to take I–75 west for about two miles to an extension of I–475 south of I–75. Such an extension would also provide convenient access to that region for traffic leaving Flint via I–475, as well as traffic on I–75. The Court feels, therefore, that the failure to consider this routing alternative to the McWain Road connector was unreasonable and should be considered on remand.

■ The Court feels the alternative of "doing nothing" was sufficiently described. The need for the project was supported with traffic volume projections on Saginaw Street, as well as on McWain Road. The environmental costs of the proposal and the alternatives reasonably available will be considered on remand. Defendants will, therefore, be in a position to make the most intelligent and beneficial decision concerning the need for the project. This is all that NEPA demands. See *Calvert Cliffs' Coordinating Committee v. U. S. Atomic Energy Commission, supra,* 146 U.S.App. D.C. at 38, 39, 449 F.2d at 1114–15.

### HEARINGS REQUIRED UNDER 23 U.S.C. § 128

At the time of the 1966 hearing, 23 U.S.C. § 128(a) required that any state highway department which submits plans for a federal aid highway project involving the bypassing of any city, to certify to the Secretary of Transportation that it held public hearings, or afforded the opportunity for such hearings, at which the *economic* effects of the highway were considered. Effective August 23, 1968, that section was amended to provide as follows:

"Any State highway department which submits plans for a federal-aid highway project involving the bypassing of, or going through, any city, town, or village, either incorporated or unincorporated, shall certify to the Secretary that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic and *social effect* of such a location, *its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community.*" (emphasis added)

In 1970, the statute was further amended to require the state to file a report with the Secretary indicating the consideration given by it to the economic, social, environmental, and other effects of ·a planned highway. See 23 U.S.C. § 128 (1970).

To implement the 1968 amendment, the Secretary issued, effective January 14, 1969, PPM 20–8, requiring the FHA to give both "location" and "design" approval before the project could receive federal funding. The approvals were to follow location and design hearings. The location hearing was held to afford an opportunity for participation by interested persons in the process of the determining the need for, and the location of, a federal aid highway, and was to provide a forum for the presentation of alternative highway locations and their social, economic, and environmental effects. By contrast, the design hearing:

"1) Is held after the route location has been approved, but before the State highway department is committed to a specific design proposal;

2) Is held to ensure that an opportunity is afforded for effective participation by interested persons in the process of determining the specific location and major design features of a federal aid highway; and

3) Provides a public forum that affords a full opportunity for presenting views on major highway design features, including the social, economic, environmental, and other effects of alternative designs."

PPM 20–8 has since become a departmental regulation and is codified at 23 CFR § 790 *et seq.* (1977).

■ Neither location approval nor design approval by the FHA creates a contractual obligation on the part of the federal government to reimburse a state for the costs of the project. *Lathan v. Brinegar,* 506 F.2d 677, 686 (CA 9, 1974). The federal government becomes contractually obligated to fund the project only when it has given plans, specifications and estimates approval (PS & E approval), see 23 U.S.C. § 106(a), which is given after a state highway department has certified to the Secretary that it has held the appropriate 128(a) hearings, or has afforded the opportunity for such hearings. See 23 CFR § 790.4(d) (1977). PS & E approval is given to an individual "project", which may consist of all the work on an entire highway or merely the right-of-way acquisition for an interchange. *Lathan v. Brinegar, supra,* 506 F.2d at 687.

As indicated above, a hearing was held in 1966 which the Court assumes was in full compliance with the law at that time. Plaintiffs argue, however, that the 1968 statutory amendment and PPM 20–8 are applicable to the project and that an additional hearing to consider the environmental and social consequences of the project is required. The Court agrees.

The courts have widely differed in their approach to determining whether the 1968 amendment is applicable to projects which had fully complied with the hearings requirements prior to that amendment. The Fourth Circuit has adopted a cost-benefit approach, holding that expanded hearings are required where the costs of altering or abandoning the proposed location would not certainly outweigh whatever benefits might be derived therefrom. See *Arlington Coalition on Transportation v. Volpe*, 458 F.2d 1323 (CA 4, 1972), *cert. denied*, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972); *Fayetteville Area Chamber of Commerce v. Volpe*, 463 F.2d 402 (CA 4, 1972); *Movement Against Destruction v. Volpe*, 361 F.Supp. 1360 (D.Md., 1973), *affirmed*, 500 F.2d 29 (CA 4, 1974); *Ward v. Ackroyd*, 344 F.Supp. 1202 (D.Md., 1972).

The Third and Fifth Circuits have held the 1968 amendment inapplicable if the project had received design approval or its equivalent prior to its effective date, August 23, 1968. *Louisiana Environmental Society v. Coleman*, 537 F.2d 79 (CA 5, 1976); *Hopewell Township Citizens I–95 Committee v. Volpe*, 482 F.2d 376 (CA 3, 1973). Recognizing that "design approval" is a concept which came into being in 1969, and the precise date, therefore, difficult to pinpoint, the Fifth Circuit holds the approval date is that which the district court could "confidently point to" as the date on which final design approval had been given. Where such a finding was not possible, PS & E approval was to be considered design approval. The Second Circuit, on the other hand, has held the 1968 amendment applicable whenever PS & E approval has been given after its effective date. See *Monroe County Conservation Council v. Volpe*, 472 F.2d 693 (CA 2, 1972). The Ninth Circuit

has similarly held the amendment applicable whenever the state submits "plans" for approval—the PS & E date being only one of a number of possible occasions for this to occur. See *Lathan v. Brinegar, supra; Keith v. California Highway Comm.*, 506 F.2d 696 (CA 9, 1974).

■■■ The Court is persuaded by the approach of the Ninth Circuit. Section 128(a) speaks in the present tense and is operative whenever a state highway department "submits plans" for approval. Further, the policies behind § 128(a) and NEPA would be better served if the hearing requirements were governed by the law as it stands when major federal decisions are made, rather than that in effect in 1966 when the project was approved. As the Ninth Circuit has stated:

> "We cannot ignore, as judges, what we know as citizens. The knowledge and attitudes of the public, of the Congress and of state and local governments about the environmental and social consequences of freeway building have drastically changed within the last decade. With knowledge has come concern, and that concern is reflected in the 1968 and 1970 amendments to section 128(a) and in NEPA. The proposed segment of I–90 is to be built in the future, and decisions about it are to be governed by the law as it reads now, not as it read in 1963."
>
> *Lathan v. Brinegar, supra*, 506 F.2d at 688–89.

See also *Monroe County Conservation Council v. Volpe, supra.* When the Secretary gave PS & E approval to this project, therefore, he was required to apply the law which was in effect at that time in determining whether the hearing requirements were complied with. See *Lathan v. Brinegar, supra*, 506 F.2d at 688. The 1968 and 1970 amendments were clearly applicable and public hearings were required to consider the environmental and social impact of the project before such approval was given. Further, such hearings were required to take into account, not only the factors outlined in section 128(a), but also

the broader environmental considerations in NEPA, including whether the project should be built at all, and as well as whether, if it is to be built, it should be built where and as previously planned. *Lathan v. Brinegar, supra,* 506 F.2d at 690.

Although defendants did not formally hold a design hearing, certain hearings were, as noted above, held in 1975 and 1976. In this connection, the Ninth Circuit has held that the requirements of § 128(a) may be substantially complied with where the pertinent environmental facts were raised and considered at other hearings:

"To all of the foregoing the state defendants respond that the design hearing that was held in June of 1970 did comply with section 128(a) as amended, that the matters that we have outlined were considered at that hearing, and that in addition, WSDH has had a large number of meetings with interested persons and groups at which the same matters were considered, in short, they claim that there has been substantial compliance with section 128(a), and that no further hearing should be required. On the record before us, we cannot tell whether this claim is sustainable . . .

"Nevertheless, because the point is strongly pressed, the district court on remand may, if it wishes, consider this claim."

*Lathan v. Brinegar, supra,* 506 F.2d at 690.

See also *Monroe County Conservation Council v. Volpe, supra.* The court noted, in this regard, that the argument in favor of substantial compliance is weaker where an EIS has been prepared after the hearings or where there is a need for expeditious disposition of the case as requiring additional hearings would avoid the delay of further appeal of the finding of substantial compliance. Compare *Louisiana Environmental Society v. Brinegar,* 407 F.Supp. 1309 (W.D.La., 1976), *remanded* 537 F.2d 79 (CA 5, 1976).

██ In this case, the Court finds there has not been substantial compliance with the section 128(a) hearing requirements.

First MDSH made it clear that these hearings were only "informational" hearings, designed, not to incorporate public comment on the environmental consequences of the proposal into a decision concerning the need for, or the location or design of, the project, but merely to "inform citizens of the decisions that are being incorporated in the final construction plans." Further, comments made by citizens at the April 20, 1976 meeting clearly indicate that they fully understood, and not without frustration, that their comments were not being considered for the purpose of altering the project as proposed. Indeed, the Court understands the primary thrust of defendant's argument is that such hearings were not required in the first instance since design approval was given prior to the 1968 amendment. Notwithstanding plaintiffs disagree that design approval was given prior to the amendment, this argument does not address the issue of whether there has been substantial compliance with the section 128(a) hearing requirements. It seems clear that, by the time the hearings on the draft ND were held in 1975 and 1976, the major decisions concerning the need for, and the proposed location and design of, the proposed project had already been made, without public comment on its social and environmental consequences. The policies behind section 128(a) and NEPA have clearly not been served in this case. An additional hearing, therefore, for the purpose of re-evaluating the need for, and the proposed location and design of, the proposal in light of public comment as to its social and environmental consequences is required. See *Lathan v. Brinegar, supra,* 506 F.2d 690; *Keith v. California Highway Comm., supra.*

### LACHES

██ As a final point, defendants argue plaintiffs are barred by laches from bringing this suit. The Court summarily rejects this claim. To prevail, defendants must show that plaintiffs unreasonably delayed in bringing suit and defendants were prejudiced by this delay. *Environmental Defense Fund v. Tennessee Valley Authority,*

468 F.2d 1164, 1182 (CA 6, 1972). Further, the strong policies embodied in NEPA concerning the importance of agency consideration of environmental values militates against barring a suit to enforce NEPA on the grounds of unreasonable delay. *Environmental Defense Fund v. Tennessee Valley Authority, supra,* 468 F.2d at 1182–83. Indeed, these considerations may in part explain why the courts have not been receptive to defenses based on unreasonable delay in suits of this type. See *Environmental Defense Fund v. Tennessee Valley Authority, supra,* 468 F.2d at 1183 and cases cited therein. An analysis of the cases in this context reveals that a defense based on delay has succeeded only where a substantial portion of the project has been completed at the time the suit was filed. See *Friends of Yosemite v. Frizzell,* 420 F.Supp. 390, 397–98 (N.D.Cal., 1976) and cases cited therein.

In this case, it is clear plaintiffs are not barred by laches. Plaintiffs have not unreasonably delayed in bringing this suit. The project was dormant from 1970 to 1975, and plaintiffs could have reasonably assumed the proposal had been suspended. Further, the complaint was filed within months of the final approval of the draft ND, the earliest point one could have determined whether NEPA was violated. Further, even if there were unreasonable delay, defendants, not having commenced construction of the project, are clearly not prejudiced. In light of these considerations, as well as the strong policies in favor of enforcing NEPA, the Court rejects the laches defense.

*RELIEF*

The failure to develop an ND detailed enough to permit the Court to exercise meaningful appellate review can justify injunctive relief until such time as the appropriate record has been prepared. *Simmans v. Grant, supra,* 370 F.Supp. at 20. Further, although other courts disagree, the Sixth Circuit holds a violation of NEPA *per se* establishes irreparable injury sufficient to grant preliminary injunctive relief. *En-*

*vironmental Defense Fund v. Tennessee Valley Authority, supra,* 468 F.2d at 1184. But see *New York v. Nuclear Regulatory Commission,* 550 F.2d 745 (CA 2, 1977).

It seems clear, however, that these cases should be limited to situations where the failure to issue an injunction would necessarily result in the irreversible commitment of a natural resource. See *New York v. Kleppe,* 429 U.S. 1307, 97 S.Ct. 4, 50 L.Ed.2d 38 (1976). As the Second Circuit noted, the failure to issue an injunction in *Environmental Defense Fund* would necessarily have resulted in immediate, demonstrable and irreparable harm to the environment. See *New York v. Nuclear Regulatory Commission, supra.* The refusal to issue an injunction in this case will not result in the irreversible commitment of a natural resource as it appears construction has not yet begun, nor have contracts been let. The Court, therefore, consistent with the approach of the D.C. Circuit in *Arizona Public Service Co. v. Federal Power Comm.,* 157 U.S.App.D.C. 272, 483 F.2d 1275 (1973), refuses to issue an injunction against the construction and instead orders the defendants, as required in this opinion, to submit a supplemental ND and a transcript of the additional hearing within ninety (90) days from the issuance of this decision. If defendants proceed with construction, plaintiffs may request injunctive relief at that time. As the Court has decided not to issue an injunction at this time, it does not consider the proper amount to be posted as security by plaintiffs under Rule 65.

Further, the Court will retain jurisdiction of the state claims until it has reconsidered the ND and whether defendants' motion to dismiss should be granted. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); compare *Hendrickson v. Wilson,* 374 F.Supp. 865 (W.D. Mich., 1973).

Plaintiffs' motion for summary judgment is DENIED; defendants' motion to dismiss or, in the alternative, summary judgment is DENIED; and the case is REMANDED to the defendants for further development of the ND in accordance with this opinion and

for an additional hearing in compliance with 23 U.S.C. § 128(a) as amended.

IT IS SO ORDERED.